**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE TRUSTEES OF THE NEW YORK STATE NURSES ASSOCIATION PENSION PLAN,<br><br>              Plaintiffs,<br><br>    v.<br><br>ANDRE HAKKAK<br><br>and<br><br>BARBARA McKEE,<br><br>              Defendants. | Civil Action No. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs the Trustees of the New York State Nurses Association Pension Plan allege as follows for their Complaint against the Defendants:

<u>Nature of the Action</u>

1.    The New York State Nurses Association Pension Plan (the "Plan") provides the principal source of retirement income for members of New York's largest union of registered nurses. This action seeks to hold Defendants Andre Hakkak and Barbara McKee accountable for mismanaging, for their own benefit and in violation of federal laws, over $100 million of assets that belong to the Plan.

2.    In 2013, Hakkak pitched the Plan on the capabilities of White Oak Global Advisors, LLC ("White Oak"), a private investment firm founded by Hakkak and McKee. Hakkak serves as White Oak's CEO and McKee as White Oak's Managing Partner. Following Hakkak's pitch, the Plan signed an Investment Management Agreement with White Oak—signed by McKee on behalf of White Oak—and ultimately entrusted White Oak to manage approximately $115 million in pension investments.

3.    Rather than managing the Plan's investments in accordance with their fiduciary obligations, Hakkak and McKee directed White Oak to engage in egregious self-dealing by (among other things) unilaterally and illegally locking up the Plan's assets in White Oak investment funds, awarding White Oak retroactive fees that the Trustees never agreed to, and granting White Oak certain indemnification rights—all of which violated White Oak's agreement with the Plan and the Employee Retirement Income Security Act ("ERISA").

4.    In 2019, after a five-day hearing at which both Hakkak and McKee sought to defend their actions in live testimony, an arbitrator found White Oak liable for misconduct, and granted the Plan monetary and other relief.  Among other things, the Arbitrator determined that White Oak repeatedly breached fiduciary duties it owed to the Plan, directed White Oak's removal as the Plan's investment manager and fiduciary, and ordered White Oak to return the Plan's money and certain fees White Oak earned.[1]  Over White Oak's objections, the United States District Court for the Southern District of New York (Kaplan J.) confirmed, with very limited modification, all aspects of the Arbitrator's award.[2]  Even so, months later the arbitration award and the Court's confirmation remain unsatisfied, the ERISA violations remain uncorrected, and the Plan's assets remain under Defendants' control.

5.    The Plan brings this action against Hakkak and McKee, who knowingly participated in, directed and/or orchestrated White Oak's breaches of fiduciary duties in violation of ERISA.  The Plan seeks disgorgement of fees collected by Defendants in connection with the Plan's investment in White Oak's funds, removal of Defendants as

---

[1] The Arbitrator's Partial Final Award is attached hereto as Exhibit A.  The Final Award is attached hereto as Exhibit B.

[2] The District Court's opinion is attached hereto as Exhibit C.

fiduciaries, the recovery of the Plan's assets—worth tens of millions of dollars—that Defendants have thus far directed White Oak to retain, and damages.

<u>Parties</u>

6.     Plaintiffs are the Trustees of the New York State Nurses Association Pension Plan, who bring this action on behalf of the Plan.  The Plan is an employee pension trust administered under ERISA and—to the extent not preempted—the laws of the State of New York, with one or more Trustees who reside in New York.

7.     On information and belief, defendant Andre Hakkak ("Hakkak") is a resident of Florida who resides in Coral Gables, Miami-Dade County.  Hakkak is a co-founder and, at all relevant times, Chief Executive Officer of White Oak, a limited liability company organized under the laws of Delaware that maintains a New York City office at 1155 Avenue of the Americas, New York, New York 10036.  In addition to serving as White Oak's CEO, Hakkak has an active role in White Oak's day-to-day activities, which includes serving as White Oak's co-portfolio manager (along with McKee), and on the entity's Investment and Operating Committees.  Hakkak also holds founding equity shares in White Oak, which, on information and belief, afford more rights and protections than other classes of White Oak equity.

8.     On information and belief, defendant Barbara McKee ("McKee") is a resident of California who resides in Half Moon Bay, San Mateo County.  McKee also is a co-founder and, at all relevant times, was the Managing Partner of White Oak.  Like Hakkak, McKee also has an active role in White Oak's day-to-day activities, which includes serving as White Oak's co-portfolio manager (along with Hakkak), and on the entity's Investment and Operating Committees.  Like Hakkak, McKee holds founding equity shares in White Oak.

Jurisdiction and Venue

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Plan brings this action under 29 U.S.C. § 1132(a).  The Plan's claims arise under federal law, and this Court has exclusive subject matter jurisdiction pursuant to 29 U.S.C. §§ 1132(e) and (f).

10.   The Court has personal jurisdiction over Defendants because this action arises from Defendants' conduct within New York City.  Among other things, Defendants met with the Plan's representatives in New York City to solicit the Plan's business with White Oak, negotiated the terms of the Plan's investment agreements with White Oak in New York City, and regularly contacted Plan representatives in New York City about White Oak's management of the Plan's assets, including meeting in-person with Plan representatives in New York City on several occasions.  Moreover, Defendants' misconduct has caused harm to the nurses of New York City and State.  Finally, Defendants have derived substantial revenue by purportedly providing services to the Plan in this State.

11.   Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

Background

**I.      Defendants Convince the Plan to Entrust White Oak with an $115 Million Investment.**

12.   In November 2013, Hakkak met with Plan representatives in New York City to pitch the Plan on investing in White Oak's funds.  During the pitch, Hakkak gave a general overview of White Oak's services and investment strategy, which involves making short-term loans directly to small- and medium-sized companies. Ex. A, Partial Final Award, at 1. White Oak would use money from its investors (which include a number of pension plans

subject to ERISA) to fund these direct loans, and its investors would realize returns based on the interest collected on the loans.  Hakkak also explained that the average duration of a White Oak loan was three years, and that White Oak targeted borrowers with an enterprise value between $50 million and $1 billion.

13.   Following Hakkak's presentation, the Trustees decided to invest with White Oak. Thereafter, the Trustees negotiated and entered into an Investment Management Agreement with White Oak, effective December 31, 2013 (the "IMA").  McKee executed the IMA on behalf of White Oak.

14.   The IMA's initial term was two years.  Under the IMA, the Plan invested an initial sum of $80 million dollars to be managed by White Oak.  As investment manager, White Oak agreed that it had certain "fiduciary responsibilit[ies] . . . including the sole, exclusive and full discretion and authority to invest plan assets . . . in one or more Vehicles consistent with the provisions of [the IMA]" and "ERISA."  Additionally, under ERISA, as White Oak's portfolio managers and Investment Committee members, Hakkak and McKee owed the Plan fiduciary duties because they (a) exercised "discretionary authority or discretionary control" over management and disposition of the Plan's assets, (b) "render[d] investment advice for a fee," and (c) had discretionary authority or responsibility in the administration of the Plan.  29 U.S.C. § 1002(21)(A).

15.   After the IMA was executed, Hakkak and McKee invested the Plan's assets into investment vehicles controlled by White Oak, including White Oak's Pinnacle Fund LP ("Pinnacle Master Fund") via White Oak's Pinnacle Feeder Fund.

16.   About a year later, the Trustees approved an IMA amendment that committed an additional $35 million of the Plan's money for investment by White Oak.  At Hakkak's and

McKee's direction, White Oak invested this new Plan money in another fund controlled by White Oak: the Summit Fund LP.

17.   White Oak personnel—including Hakkak and McKee—signed the Limited Partnership Agreements ("LPAs") and accompanying subscription documents that governed the Pinnacle Feeder Fund, Pinnacle Master Fund, and Summit Fund on behalf of both the Plan and White Oak.  No Plan Trustee, officer, or employee signed those documents.

## II.   The Plan Begins to Uncover Defendants' Misconduct After Defendants Secretly Negotiate with and Hire Away the Plan's Chief Investment Officer.

18.   As the IMA's two-year term came to an end in late 2015, White Oak and the Plan renewed the IMA, with Hakkak's input, under virtually identical terms.

19.   Unbeknownst to the Plan's Trustees, however, Hakkak and McKee were surreptitiously courting the Plan's Chief Investment Officer, Russell Niemie, to join White Oak, at the same time that Niemie was recommending to the Trustees that White Oak's IMA be renewed.  To conceal these discussions from Plan representatives, Hakkak and Niemie moved their correspondence to their personal email addresses.

20.   In November 2015, Niemie used his business email to write Hakkak saying he and his wife would "love to join [Hakkak's'] family and friends for 'Crab Night,'" and then mentioned that he was "officially winding down from NYSNA but still a little unsure about the future.  Let's talk soon."  Roughly two weeks later, Hakkak, Niemie and their families went out for dinner — Hakkak suggested that he and Niemie could "enjoy a [ci]gar after." Three days later, Hakkak emailed Niemie to ask his availability to "catch up further ... to brainstorm a bit more."

21.   On December 2, 2015, Hakkak and Niemie spoke and agreed to arrange for Niemie to meet with Hakkak, McKee, and other White Oak principals at White Oak's San

Francisco office to discuss Niemie joining White Oak.  Following the December 2 call, Niemie began corresponding with Hakkak using his personal email address.

22.   The very next day, December 3, 2015, Niemie wrote a memo to the Plan's Trustees recommending that they renew the IMA with White Oak for another two years. Although Hakkak and McKee were fiduciaries of the Plan and Niemie was the senior Plan staff member responsible for overseeing the relationship with White Oak, Hakkak and McKee did not disclose to the Trustees the recruiting discussions that they were having with Niemie.

23.   Two weeks after Niemie recommended renewal of White Oak's contract, he met with Hakkak, McKee, and other White Oak principals in their San Francisco office to discuss his employment.  A few weeks later, the Plan's Trustees—still not having been informed about Hakkak and McKee's recruitment of Niemie, or Niemie's secret trip to San Francisco—accepted Niemie's recommendation to renew the IMA with White Oak.  The renewed IMA became effective January 1, 2016, with McKee signing on behalf of White Oak.  Roughly a month later, on February 6, 2016, Niemie and White Oak executed an employment term sheet for an executive position at White Oak.

24.   Had the Trustees known about Hakkak's and McKee's recruitment of Niemie at the time, the Trustees would not have relied on Niemie's recommendation when deciding whether to renew the IMA.  As the Arbitrator later found after trial, and the District Court confirmed, despite all being fiduciaries of the Plan, neither Niemie, Hakkak, nor McKee disclosed the blatant conflict of interest that Defendants created by courting Niemie to join White Oak as a partner while he was making a recommendation about renewing the Plan's IMA with White Oak.  Ex. A at 7; Ex. C at 4–5.

25.   The Plan learned of Niemie's new position as Vice-Chairman of White Oak by chance from his updated LinkedIn profile—*after* Niemie joined White Oak.  Upon discovering the surprising news that White Oak had hired the Plan's CIO in the midst of the IMA renewal process, the Trustees asked the Plan's new CIO, Case Fell, to look more closely at White Oak and the other investment managers that Niemie had recommended.

26.   Fell quickly discovered that White Oak—whose performance Niemie previously supervised—had been failing to meet certain obligations under the IMA with respect to its fee structure, reporting, and other matters.  The Trustees decided upon Fell's recommendation to restrict White Oak from making additional capital commitments on the Plan's behalf because the Plan no longer trusted White Oak to manage the Plan's investments in a manner consistent with fiduciary and contractual obligations.  Despite being placed on probationary status, and notwithstanding that the Plan did not want to further its investment with White Oak, White Oak continued to make capital calls from the Plan to fund commitments that White Oak already made—under Hakkak and McKee's direction—with the Plan's investments.

27.   Over the course of the next year, the Plan monitored the White Oak account and held diligence meetings with Hakkak, McKee, and other White Oak personnel (including at least one meeting in White Oak's New York City office) to discuss White Oak's performance issues.

28.   As part of this process, Fell made inquiries about White Oak's compliance with the "most favored nations" clause in the IMA.  Fell noticed that the management fees charged to the Plan in connection with its investment under the Pinnacle Fund were 1.35%, but only 1% on the Summit Fund.  After inquiring, Fell was given contradictory explanations by McKee and by White Oak's counsel, which led the Plan to ask White Oak to provide

information on the fee structures of other White Oak clients.  After reviewing the information, Fell wrote to White Oak and requested reimbursement of overpaid fees.  White Oak disputed that any of its other clients triggered the MFN obligations; the Plan asked for an in-person meeting on December 20, 2017 in New York so that White Oak could explain its changing and inconsistent positions.

29.   The meeting never occurred because, on December 18, 2017—two days prior to the scheduled meeting—Hakkak and McKee notified the Plan that they were unilaterally terminating the IMA, subject to the IMA's notice period.  Hakkak and McKee stated that, after the 90-day notice period, White Oak would no longer adhere to the obligations under the IMA; instead, notwithstanding clear contractual requirements to return the Plan's money, White Oak unilaterally determined that the Plan's assets would remain under White Oak's management, and the investment would be governed by the White Oak Fund documents instead of the IMA.

30.   Realizing that after the 90-day notice period expired the Plan would be without any of the protections afforded under the IMA while White Oak continued to manage the Plan's assets, the Trustees invoked their right under the IMA to extend the agreement for six months.  The IMA terminated thereafter on September 18, 2018, but the Plan's money was not returned.  In spite of the clear contractual and legal requirements, and despite due demand, White Oak retained control of the Plan's money in White Oak investments and continued to charge fees against them.

31.   The Plan subsequently discovered extensive breaches by White Oak and its principals of their ERISA fiduciary duties owed to the Plan.  In particular, the Trustees became aware that White Oak and the Defendants violated their duty of loyalty, which

obligates a fiduciary to act "solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits" to them.  29 U.S.C. § 1104(a)(1), ERISA §404(a)(1).  White Oak and Defendants also violated *per se* prohibitions against a fiduciary "deal[ing] with the assets of the plan in his own interest or for his own account."  29 U.S.C. § 1106(b)(1).  They did this by designing the terms of the Plan's investment in the White Oak Funds such that White Oak and Defendants earned fees, compensation, and/or other benefits beyond those that were specifically agreed to by the Trustees under the IMA

32.   Prior to the termination of the IMA in September 2018, the Plan demanded that White Oak return the Plan's money.  White Oak declined and retained the Plan's investment.

### III.   The Arbitration and District Court Proceedings

33.   The Plan initiated an arbitration against White Oak on July 31, 2018.  After a week-long December 2019 hearing with testimony from 11 witnesses, including Hakkak and McKee, the Arbitrator (Rosemary Townley) issued a Partial Final Award on November 30, 2020 and a Final Award on August 4, 2021.  Ms. Townley ultimately concluded that White Oak engaged in "numerous prohibited transactions pursuant to ERISA Section 406(b)(1) [and 29 U.S.C. §] 1106(b)(1) and as a result received either compensation or benefits beyond that agreed to by the Trustees under the IMA."  *See* Ex. A at 15; Ex. B. at 10 (incorporating the Partial Final Award's findings into the Final Award).

34.   During the arbitration proceedings, the Plan identified at least four ways in which White Oak and its principals breached their ERISA fiduciary duties.  The existence of fiduciary breaches by White Oak has since been confirmed by a federal district court.  Hakkak and McKee are likewise liable for these breaches of ERISA fiduciary duties by virtue of directing, orchestrating, and knowingly participating in, White Oak's misconduct, including without limitation as follows:

### A.    Failure to Return the Plan's Assets upon Termination of the IMA

35.    Hakkak and McKee, as the CEO, Managing Partner, and co-portfolio managers of White Oak, refused to return the Plan's money, even after they unilaterally terminated the IMA.

36.    Under the IMA that McKee executed on behalf of White Oak, White Oak was required to "transfer all books, records, accounts, cash, securities, (and other evidences of ownership) and all other property of the Plan" within 30 days of the IMA's termination.  Even though the IMA terminated on September 18, 2018, Hakkak and McKee caused (and continue to cause) White Oak to maintain control over the Plan's cash and other assets, in violation of the IMA and their ERISA fiduciary duties.

37.    By directing White Oak to refuse to return the Plan's cash and other assets, Hakkak and McKee improperly benefitted and continue to benefit themselves in violation of 29 U.S.C. § 1106(b)(1), ERISA § 406(b)(1).  Despite the termination of the IMA, and White Oak's obligation under the IMA to return the Plan's "cash," White Oak, which Defendants control and from which Defendants profit, continued to control the Plan's money and earn fees for managing the Plan's investments.  Defendants benefit directly as White Oak's sole founding equity shareholders.

### B.    The Improper LPA Lock-Ups

38.    Hakkak and McKee also executed LPAs on behalf of the Plan that "locked up" the Plan's assets in White Oak's Funds, in express violation of the IMA and ERISA.  Ex. A at 8–9.

### 1.    Pinnacle Feeder Fund Lock-Up Terms

39.   No Trustees of the Plan signed the Pinnacle Feeder Fund LPA.  Defendant McKee signed the Pinnacle Feeder Fund LPA on behalf of White Oak, and White Oak's General Counsel signed the LPA purportedly on behalf of the Plan.

40.   Under the Pinnacle Feeder Fund LPA and the subscription documents, the Plan could "not voluntarily withdraw from the Partnership prior to its dissolution," and was "not entitled to cancel, terminate or revoke the subscription or any agreements of the [Plan] hereunder."  This meant that the $80 million that the Plan initially committed to White Oak was *irrevocably* committed by White Oak to the Pinnacle Feeder Fund partnership that Defendants managed.

41.   That lock-up term was contrary to the termination rights in the IMA, which, as the Arbitrator explained, "provides the Plan with the right to terminate the IMA 'at any time' 'without penalty[.]'"  *See* Ex. A at 23–24.

42.   The lock-up benefitted Hakkak and McKee by contractually obligating the Plan to pay White Oak fees indefinitely until the dissolution of the Fund.  Hakkak and McKee, as founding shareholders with top-tier equity, stood to benefit handsomely from removing the Plan's right to withdraw from the Pinnacle Fund.  Conferring this benefit on themselves constituted a prohibited transaction by violating ERISA's prohibition on self-dealing.  *See* 29 U.S.C. § 1106(b), ERISA § 406(b); *see also* Ex. A at 25; Ex. C at 7.

43.   The irrevocable lock-up terms are also contrary to specific ERISA regulations that require a pension plan be able to terminate a contract with a fiduciary on reasonably short notice without penalty.  *See* 29 C.F.R. § 2550.408b-2(c)(3).

2.      **Pinnacle Master Fund and Summit Fund Lock-Up Terms, and Amended Pinnacle Feeder Fund Lock-Up Term.**

44. The Pinnacle Master Fund and the Summit Fund LPAs also had lock-up terms, which granted White Oak "the 'sole discretion' to refuse to return the Plan's assets and instead substitute an interest-bearing note, at a rate of White Oak's determination." Ex. A at 24.  After the Plan initiated the arbitration against White Oak, McKee executed a unilateral amendment to the withdrawal provision in the Pinnacle Feeder Fund LPA so that it no longer contained an absolute prohibition on withdrawing from the Fund, but rather mirrored the lock-up provisions in the Pinnacle Master Fund and Summit Fund LPA.

45.  According to the Arbitrator, these lock-up provisions constitute "another deviation from the IMA, which requires a return to the Plan of 'all books, records, accounts, cash, securities' upon termination[.]"  Ex. A at 24.  That's because the lock-up terms restricted the Plan's ability to withdraw from the Funds by giving White Oak—controlled by Hakkak and McKee—the unilateral right to decide not to return the Plan's investment upon a request to withdraw, but instead to convert that investment into a loan to White Oak.

46.  By granting White Oak the unilateral ability to retain the Plan's assets under White Oak's control and management, these "lock-up" provisions allowed White Oak to continue to collect fees on the Plan's assets, even after the IMA ceased to be effective and even after the Plan demanded withdrawal.  Hakkak and McKee would be enriched accordingly, as White Oak's sole founding shareholders with top-tier equity.

47.  As a result, the lock-ups constitute prohibited transactions under ERISA Section 406.

### C.   Retroactive "Day One" Fees

48.   White Oak and Defendants also gave themselves fees taken from Plan assets that they were not entitled to under the IMA.  White Oak, directed by Hakkak and McKee, charged retroactive fees equal to what the Plan would have been charged if it had invested in the Pinnacle Master Fund from "Day One."  But "Day One" of the Pinnacle Master Fund was almost two years before the Plan actually invested in the Fund.

49.   Those retroactive fees totaled $1,929,836.07.

50.   The retroactive "Day One" fees were not authorized by the Trustees under the IMA, and, as found by the Arbitrator and confirmed by the District Court, "was a standalone ERISA violation."  Ex. C at 23.  Indeed, the IMA's fee schedule permitted White Oak to collect a management fee only for services rendered during the period when the IMA was in effect—not for periods before the IMA was ever signed or effective.  When she testified during the arbitration, McKee admitted that she could not identify any authority in the IMA for the retroactive "Day One" fees.

51.   Hakkak signed the Pinnacle Master LPA documents that contained this improper retroactive "Day One" fee provision.  No Trustee agreed to it.

52.   By causing White Oak to charge this improper retroactive "Day One" fee, Hakkak and McKee enriched both White Oak and themselves, as White Oak's sole founding shareholders.

### D.   Unilateral Indemnification in Favor of White Oak

53.   Finally, exercising their fiduciary authority under the IMA, Hakkak and McKee executed the LPAs that caused White Oak unilaterally to commit the Plan to indemnifying both Defendants themselves and White Oak against any losses or claims caused by White Oak's conduct.

54. The indemnifications doubly benefited Defendants. First, under the LPAs Hakkak and McKee granted themselves indemnity as individual officers in White Oak. Second, as founding shareholders, they benefited from limiting White Oak's potential exposure to liabilities.

55. No Plan Trustee agreed to or signed the LPAs, and the indemnity provisions in the LPAs were inconsistent with the terms the Trustees did agree to in the IMA.

56. The Arbitrator concluded, and the District Court confirmed, that these indemnification rights constituted prohibited transactions under ERISA Section 406(b)(1). *See* Ex. A at 20–21 and Ex. C at 7.

### E.    *Remedies for White Oak's Breaches*

57. As confirmed by the District Court, the Arbitrator's August 4, 2021 Final Award ordered (1) removal of White Oak as fiduciary and investment manager; (2) disgorgement of profits; (3) disgorgement of the "Day One" management fees in the amount of $1,929,836.07, plus prejudgment interest at 9% per annum; (4) disgorgement of the net asset value of the Plan's assets as of August 4, 2021, plus prejudgment interest at 9% per annum; and (5) $5,722,249.35 in attorneys' fees and costs. *See* Ex. C at 11–28; Ex. B at 10–11.

## IV.    Defendants Direct White Oak to Evade the District Court's Judgment, and to Continue Breaching Their Fiduciary Duties to the Plan.

58. White Oak, as directed by Hakkak and McKee, have flouted the Arbitrator's Final Award and the District Court's judgment confirming it.

59. For example, about a month after the Arbitrator issued the Final Award, McKee subscribed the Plan to the White Oak Commercial Aviation HoldCo, L.P. (the "Aviation Fund"). Despite the Arbitrator's earlier conclusion that the indemnification rights in the Summit, Pinnacle Feeder, and Pinnacle Master Funds' LPAs violate ERISA, McKee granted

herself and Hakkak *nearly identical indemnification rights* in the Aviation Fund's LPA, once again at the Plan's expense.

60.   Thus, Hakkak and McKee have directed White Oak to enter into *yet another* prohibited transaction, and to breach its (and Hakkak's and McKee's) fiduciary duties to the Plan *yet again*.

61.   Upon information and belief, Defendants and White Oak continue to serve as Plan fiduciaries and continue to engage in prohibited transactions contrary to their fiduciary responsibilities.

62.   Moreover, after unsuccessfully asking the District Court to vacate its judgment confirming the arbitration award, White Oak simply has refused to pay a dime to the Plan.

63.   Additionally, White Oak has ignored the injunctive relief confirmed by the District Court.  On a call with the Plan's counsel that McKee attended, White Oak's counsel told the Plan's counsel that, while White Oak was transferring some assets to the Plan, those assets would include investments that White Oak continued to manage and White Oak would continue to serve as the Plan's investment manager even though the now-confirmed Arbitrator's award directed White Oak to relinquish control.

64.   White Oak's course of action was directly contrary to the District Court's clear directive that "White Oak cannot satisfy its obligation through an in-kind distribution of fractional interests in instrument that it controls." Ex. C at 19.

65.   Hakkak and McKee also have acted to thwart the Plan's judgment enforcement efforts.  For example, in May 2021, the Plan subpoenaed the third-party administrator of the White Oak Funds, SEI Investments Company, to obtain information on the net asset value of the Plan's assets ordered to be disgorged.  But Hakkak and McKee instructed SEI to refuse to

comply with the Plan's subpoenas.  This has caused the Plan to file a motion to compel SEI's compliance with the Plan's subpoena.

66.   Defendants are thus blocking a subpoena for information—the value of the Plan's assets in White Oak investments—that Defendants have a *duty* to provide voluntarily. Moreover, as fiduciaries they have placed other onerous restraints on disclosure of information to the Plan.  To date, they have provided limited information about the assets they purported to transfer to the Plan, and have even limited which counsel for the Plan can participate in calls on that subject.  The limited information that Defendants provide to the Plan is yet another way that they continue to exercise control over the Plan's assets—in violation of the arbitration award and the District Court's judgment and their ERISA fiduciary obligations.

67.   The Plan has been forced to expend substantial time and resources pursuing White Oak's assets in an attempt to satisfy the binding judgment against White Oak, and to finally secure the return of the Plan's money.  These efforts would not be necessary if Hakkak and McKee simply directed White Oak to return the Plan's money, and to comply with the District Court's judgment.

**V.    Hakkak and McKee Actively Participated in White Oak's Self-Dealing.**

68.   Hakkak and McKee have directed, approved, controlled, knowingly participated in, or been aware of all of White Oak's conduct described above, including the various fiduciary breaches.

69.   Defendants have continually acted in White Oak's interests—which are ultimately the interests of Hakkak and McKee's own pocketbooks—instead of the Plan's.

70.  As set forth above, Hakkak and McKee are the only partners to have founding equity shares in White Oak.  They are also White Oak's two highest-ranking executives: Hakkak serves as CEO and McKee as Managing Partner.

71.  Defendants also hold two of the five seats on White Oak's Operating Committee, two of the five seats on White Oak's Investment Committee, and two of four seats on White Oak's Compensation Committee.

72.  The Operating Committee has oversight over White Oak's operations, investments, financial, legal and compliance, and reporting functions.

73.  Hakkak and McKee therefore exert substantial discretion and control over White Oak's business, decision making, and employees.

74.  Hakkak and McKee have benefited personally from their and White Oak's self-dealing.  Defendants are the only two White Oak partners with founding equity shares in the company.  Accordingly, when White Oak earns any revenue or profit, the largest share of that income goes to Hakkak and McKee.  Thus, for example, when Hakkak and McKee directed White Oak to charge the Plan retroactive "Day One" fees, Hakkak and McKee earned additional income.  Similarly, when Hakkak and McKee locked up the Plan's assets beyond the two-year period permitted by the IMA, Hakkak and McKee were guaranteeing themselves—at the Plan's expense—income for years into the future.

### Count I
### (Violation of ERISA § 404, 29 U.S.C. § 1104)

75.  The Plan incorporates paragraphs 1 through 74 of this Complaint.

76.  At all relevant times, defendants Hakkak and McKee served as fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

77. ERISA requires that fiduciaries manage a pension plan's assets solely in the interests of the plan's participants and beneficiaries, for the exclusive purposes of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan.

78. Defendants committed numerous breaches of their fiduciary duty of loyalty to the Plan.  These breaches include, but are not limited to:

    a.    Using their discretionary authority to execute agreements that locked up the Plan's assets;

    b.    Charging the Plan a $1.9 million retroactive Day One fee that was contrary to the fee agreement agreed to by the Trustees as expressed in the IMA;

    c.    Using their discretionary authority to execute agreements that granted White Oak indemnity rights not granted by the Trustees under the IMA;

    d.    Failing to disclose to the Plan that they were secretly recruiting the Plan's CIO while that same CIO made recommendations regarding the IMA renewal—thereby exacerbating a blatant conflict of interest that Defendants created;

    e.    Failing to direct White Oak to return the Plan's money after unilaterally terminating the IMA; and

    f.    Failing to correct prohibited transactions under ERISA, even after being ordered to do so by the Arbitrator.

79. As a direct and proximate result of these breaches of fiduciary duty, and others, the Plan has suffered the following harms: among other things, the Plan has been made to pay

fees to Defendants and to White Oak for years after termination of the IMA; the Plan has lacked control of its money for years after Defendants unilaterally terminated the IMA; the Plan has been forced to entrust its money to a faithless fiduciary; the Plan renewed an IMA that it would not have otherwise renewed, had it known of the blatant conflicts of interest; the Plan was subject to regular capital calls to satisfy commitments made by that faithless fiduciary; the Plan remains locked into investments that have not performed as expected; and the Plan has been forced to expend resources pursuing White Oak's assets to satisfy the District Court's judgment and finally secure the return of the Plan's money.

80.   Defendants Hakkak and McKee benefited directly from these breaches.  They are the only two White Oak partners with founding equity shares in the LLC.  For example, when Hakkak and McKee directed White Oak to charge the Plan "Day One" fees, Hakkak and McKee increased their own income.

81.   By directing White Oak to refuse to comply with the Arbitrator's award and the District Court's Judgment confirming that award, Defendants continue to breach their fiduciary duties of loyalty to the Plan.

### Count II
### (Violation of ERISA § 406(b), 29 U.S.C. § 1106(b))

82.   The Plan incorporates Paragraphs 1 through 81 of this Complaint.

83.   At all relevant times, defendants Hakkak and McKee served as fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

84.   ERISA bars fiduciaries from engaging in "prohibited transactions," which is defined in part as "deal[ing] with the assets of the plan in his own interest or for his own account."

85.  As the Arbitrator found and the District Court confirmed, "White Oak has engaged in numerous prohibited transactions pursuant to ERISA Section 406(b)(1), [2]9 U.S.C. Sec. 1106 (b)(1) and as a result received either compensation or benefits beyond that agreed to by the Trustees under the IMA."  Ex. A at 15.

86.  These prohibited transactions include, but are not limited to:

a.    Using their discretionary authority to execute agreements that locked up the Plan's assets;

b.    Charging the Plan a $1.9 million retroactive Day One fee that was contrary to the IMA;

c.    Using their discretionary authority to execute agreements that granted White Oak indemnity rights not granted under the IMA;

d.    Failing to disclose to the Plan that they were secretly recruiting the Plan's CIO while that same CIO made recommendations regarding the IMA renewal—thereby exacerbating a blatant conflict of interest that Defendants created;

e.    Failing to direct White Oak to return the Plan's money after unilaterally terminating the IMA; and

f.    Failing to correct prohibited transactions under ERISA, even after being ordered to do so by the Arbitrator.

87.  As set forth above, Defendants actively participated in these prohibited transactions in their roles as principals of, and decision makers for, White Oak, and by signing documents in their capacities as Plan fiduciaries that committed the Plan to these prohibited transactions.

88.   As a direct and proximate result of these prohibited transactions, Defendants benefitted themselves by, for example, collecting fees from the Plan that were not authorized by the Trustees and, by giving themselves the benefit of an indemnity right backed-up by Plan assets, "risked the Plan's assets … to aid" themselves and White Oak.  Ex. A at 30 (cleaned up).

89.   Also as a direct and proximate result of these prohibited transactions, and others, the Plan has suffered the following harms: among other things, the Plan has been made to pay fees to Defendants and to White Oak for years after termination of the IMA; the Plan has lacked control of its money for years after Defendants unilaterally terminated the IMA; the Plan has been forced to entrust its money to a faithless fiduciary; the Plan renewed an IMA that it would not have otherwise renewed, had it known of the blatant conflicts of interest; the Plan was subject to regular capital calls to satisfy commitments made by that faithless fiduciary; the Plan remains locked into investments that have not performed as expected; and the Plan has been forced to expend resources pursuing White Oak's assets to satisfy the District Court's judgment and finally secure the return of the Plan's money.

90.   Moreover, by directing White Oak to refuse to comply with the Arbitrator's award and the District Court's Judgment confirming that award, Defendants have prevented the correction of prohibited transactions that they caused the Plan to enter into.

**Count III**
**(Violation of ERISA §§ 406(a), 408(b), 29 U.S.C. §§ 1106(a), 1108(b))**

91.   The Plan incorporates Paragraphs 1 through 90 of this Complaint.

92.   At all relevant times, defendants Hakkak and McKee served as fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

93.   Under ERISA section 408 and its implementing regulations, specify that contracts between a pension plan and a service provider, such as an investment manager like Defendants, are unreasonable and prohibited as a matter of law if the contract "does not permit termination by the plan without penalty to the plan *on reasonably short notice* under the circumstances to prevent the plan from becoming locked into an arrangement that has become disadvantageous."  29 U.S.C. § 1108(b)(2); 29 C.F.R. § 2550.408b-2(c)(3) (emphasis added).

94.   The Pinnacle Feeder Fund LPA that Defendants committed the Plan to violated this requirement because it expressly prohibited the Plan from terminating the agreement at all.  Specifically, that LPA provided that the Plan could not "voluntarily withdraw" from the Pinnacle Feeder Fund "prior to its dissolution and winding up"—after a period of at least seven years and as much as ten years, subject to White Oak's sole discretion.

95.   Though Defendants later changed this lock-up provision to allow for an interest bearing note, the original LPA language still violated 29 U.S.C. § 1108(b)(2) and its implementing regulations.

96.   Furthermore, regardless of the contractual provisions, Hakkak and McKee have caused the Plan's assets to be locked up as a matter of fact.  Notwithstanding that the Plan demanded return of its money and termination of White Oak as investment manager in 2018, Defendants continue to exercise control over the Plan's money.

97.   As a direct and proximate result of this prohibited and prolonged lock-up, Defendants have benefited themselves and damaged the Plan.

98.   By directing White Oak to refuse to comply with the Arbitrator's award and the District Court's judgment confirming that award, Defendants continue to lock up the Plan's investments in violation of ERISA.

**Count IV**
**(Violation of ERISA § 405(a), 29 U.S.C. 1105(a))**

99.   The Plan incorporates Paragraphs 1 through 98 of this Complaint.

100. At all relevant times, defendants Hakkak and McKee served as fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

101. ERISA creates liability for co-fiduciaries that knowingly participate in or conceal the fiduciary breaches of others; enable others' fiduciary breaches; or have knowledge of another's breach without making efforts to remedy it.

102. As set forth above, Hakkak and McKee knowingly participated in each of White Oak's fiduciary breaches.  Indeed, they enabled and directed these breaches as executives of White Oak and members of its Investment and Operating Committees.

103. For example, both McKee and Hakkak actively participated in White Oak's fiduciary breaches by knowingly executing LPAs that contained the lock-up and indemnity provisions, and by collecting unauthorized retroactive fees of nearly $2 million.

104. Hakkak and McKee also failed to make reasonable efforts to remedy Russell Niemie's breach of fiduciary duty—and their own associated breaches—when Niemie recommended that the Trustees renew the IMA while actively engaging in talks to join White Oak.

105. Finally, they are enabling White Oak to breach its fiduciary duty by refusing to relinquish control of the Plan's money.

106. As a direct and proximate result of these co-fiduciary breaches, Defendants have benefited themselves and damaged the Plan.

107. By directing White Oak to refuse to comply with the Arbitrator's award and the District Court's Judgment confirming that award, Defendants continue to participate in White Oak's breaches of fiduciary duty.

### **Prayer for Relief**

WHEREFORE, the Plan requests that the Court enter a judgment for the Plan and award the Plan the following relief:

    a.  Disgorgement of any and all fees and other compensation they personally received, directly or indirectly, in connection with management of the Plan's assets;

    b.  Removal of Defendants as the Plan's fiduciaries;

    c.  Defendants shall direct White Oak to comply with the Arbitrator's award as confirmed by the District Court;

    d.  Compensatory damages in an amount to be determined at trial;

    e.  The Plan's attorneys' fees and costs incurred in connection with this suit; and

    f.  Such other and further relief as the Court may deem just and proper.

Respectfully submitted,


COVINGTON & BURLING LLP

s/ *C. William Phillips*
C. William Phillips

Jonathan M. Sperling
Christopher Y. L. Yeung
Cléa P.M. Liquard
Andrew Leff
Andrew J. Timmick
The New York Times Building
620 Eighth Avenue
New York, NY 10018
212-841-1000
cphillips@cov.com
jsperling@cov.com
cyeung@cov.com
cliquard@cov.com
aleff@cov.com
atimmick@cov.com

Robert Newman
David Leapheart
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
202-662-6000
rnewman@cov.com
dleapheart@cov.com

*Attorneys for Plaintiffs Trustees of the New*
*York State Nurses Association Pension Plan*

New York, New York
Dated: July 2, 2022