# EXHIBIT A

## AMERICAN ARBITRATION ASSOCIATION
## COMMERCIAL PANEL
### CASE No. 04-18-0002-9281

-------------------------------------------------------------------------------------------

|  |  |
|---|---|
| **THE TRUSTEES OF THE NEW YORK STATE NURSES ASSOCIATION PENSION PLAN,** | : |
| | : |
| | : |
| **Claimants,** | : |
| | : |
| **v.** | : |
| | : |
| **WHITE OAK GLOBAL ADVISORS, LLC,** | : |
| | : **Arb. Rosemary Townley** |
| **Respondent,** | : |

-------------------------------------------------------------------------------------------

### REASONED AWARD

| **FOR CLAIMANTS** | **FOR RESPONDENTS** |
|---|---|
| C. William Phillips | Todd Wozniak |
| Jonathan M. Sperling | HOLLAND & KNIGHT |
| Robert Newman | 1180 W. Peachtree St., N.W. |
| COVINGTON & BURLING LLP | Suite 1800 |
| The New York Times Bldg. | Atlanta, Georgia  30309 |
| 620 Eighth Avenue | todd.wozniak@khlaw.com |
| New York, NY   10018 | |
| cphillips@cov.com | Lindsey R. Camp |
| jsperling@cov.com | HOLLAND & KNIGHT LLP |
| rnewman@cov.com | 777 South Flagler Drive |
| | Suite 1900 |
| | West Palm Beach, Florida  33401 |
| | lindsey.camp@hklaw.com |
| | |
| | Leslie A. Klein |
| | GREENBERG TRAURIG |
| | 2375 East Camelback Road |
| | Suite 700 |
| | Phoenix, Arizona  85106 |
| | klein@gtlaw.com |

*MansiKarol@adr.org*

*rt@townleyadr.com*

**AMERICAN ARBITRATION ASSOCIATION**
**COMMERCIAL PANEL**
**CASE No. 04-18-0002-9281**

------------------------------------------------------------------

**THE TRUSTEES OF THE NEW YORK**    :
**STATE NURSES ASSOCIATION**     :
**PENSION PLAN,**         :
            :
     **Claimants,**    :
            :
    **v.**         :
            :
**WHITE OAK GLOBAL ADVISORS, LLC,** :
            : **Arb. Rosemary Townley**
     **Respondent,**   :

------------------------------------------------------------------

**REASONED AWARD**

**FOR CLAIMANTS**

C. William Phillips
Jonathan M. Sperling
Robert Newman
COVINGTON & BURLING LLP
The New York Times Bldg.
620 Eighth Avenue
New York, NY   10018
cphillips@cov.com
jsperling@cov.com
rnewman@cov.com

**FOR RESPONDENTS**

Todd Wozniak
HOLLAND & KNIGHT
1180 W. Peachtree St., N.W.
Suite 1800
Atlanta, Georgia  30309
todd.wozniak@khlaw.com

Lindsey R. Camp
HOLLAND & KNIGHT LLP
777 South Flagler Drive
Suite 1900
West Palm Beach, Florida  33401
lindsey.camp@hklaw.com

Leslie A. Klein
GREENBERG TRAURIG
2375 East Camelback Road
Suite 700
Phoenix, Arizona  85106
klein@gtlaw.com

**INTRODUCTION: PARTIAL FINAL AWARD**

**General Background**

The New York State Nurses Association Pension Plan (the "NYSNA PP" or the "Plan") manages approximately $4 billion in funds for the oldest union of registered nurses in the United States.  It is governed by its Trustees ("Trustees") who employ investment staff to manage various aspects of its investments.  The staff is headed by a Chief Investment Officer ("CIO") who receives support from a director of research, an analyst, and administrative assistants.  The Plan's Trustees hire outside financial consultants who locate and conduct due diligence on potential investment managers in order to recommend to the Trustees and Plan counsel on the viability of the retaining of an investment manager and whether an investment management agreement is supported.

In early 2013, the Plan and its then-CIO, Russell Niemie ("Niemie") and members of the investment staff began searching for an investment manager who specialized in the fixed income market to supplement low to negative projected returns for the Plan's fixed income portfolio.  See J-6.  Niemie identified White Oak Global Advisors, LLC ("White Oak") as a potential investment manager for the Plan.

On November 15, 2013, White Oak's co-founder and CEO, Andre Hakkak, met in person with the Trustees, Niemie and Plan investment staff and presented a general overview of the services of the White Oak team, its investment strategy and performance with respect to "direct lending." J-6, J-6A.  CEO Hakkak advised the Trustees the Plan could work with White Oak by either investing into specific comingled funds managed by White Oak or in a separately managed account ("SMA") with White Oak. J-6, J-6A.  The latter option would result in White Oak managing the Plan's money pursuant to an investment management agreement ("IMA") that would

grant White Oak the sole discretion authority to choose specific investments for the Plan.  At that

time, Hakkak advised the Trustees that only the Pinnacle Fund was open for investment.

After negotiations between the respective attorneys and additional due diligence by outside

consultants such as the Meketa Research Group, recommendations were presented to Plan Staff and

Plan counsel. White Oak-21. The Trustees decided to execute an IMA which contained language

whereby the Plan would retain White Oak as an investment manager to decide on Plan investments

pursuant to White Oak's own "sole and exclusive investment discretion and management."

Thereafter, the parties entered an IMA effective December 31, 2013. J-1

**Selected Terms of the Parties' IMA**

Paragraph 1 (a) of the IMA granted the Investment Manager "sole, exclusive and full

discretion and authority to invest plan assets, or the "Allocation Amounts," as set forth in

Schedule C of the IMA "[i]n one or more Vehicles ...  in a total amount not to exceed the

Allocated Amount … consistent with the provisions of this Agreement and the ... Investment

Guidelines, as that term is defined is subparagraph 1(c) hereof."

Paragraph 1 (b) of the IMA defines the Investment Manager as "a result of this

appointment and delegation, having the "[s]ole responsibility for the investment for the

Allocated Amount in one or more Vehicles and the management of the Investment Account

Assets and, to the extent permitted under ERISA, the trustees shall not be liable for any acts or

omissions of the Investment Manager or to be under any obligation to invest or otherwise

manage the Investment Account Assets."

The Investment Guidelines that were to direct the Investment Manager's role were

referenced in Subchapter 1 (c) of the IMA whereby the assets of the Plan were to be managed

[i]n accordance with and subject to: (i) terms and conditions of this Agreement, including any

2

statement of investment policy and written investment guidelines or directions which, from time

to time shall be promulgated by the Trustees and delivered to the Investment Manager,

expressing investment objectives, restrictions and policies of the Trustees (collectively "the

"Investment Guidelines"), which Investment Guidelines, and any future amendments thereto,

shall be incorporated by reference into the Agreement, provided, however, … the issuance of

any Investment Guidelines or other directions to the Investment Manager shall not in any

manner be construed as an acceptance by the Trustees of any investment management discretion

or authority to make in Vehicles … (and the Trustees shall not, as a result of issuing

investment Guidelines or other directions, be liable for any acts or omissions of the Investment

Manager with respect to any of the Investment Account Assets); (ii) compliance with ERISA

and other applicable law; and (iii) the current funding policy and method that have been

established to carry out the objectives of the Trust and Plan… [i]nvest ... plan assets ... [in] one

or more Vehicles and to manage the Investment Account Assets in accordance with and subject

to: the terms and conditions of this Agreement, including any statement on investment policy

and written investment guidelines... [and] (ii) compliance with ERISA and other applicable law.

Section 4 sets forth the controlling Investment Guidelines governing White Oak's

discretionary authority, providing that "White Oak [was] expected to invest only in securities,

limited liability companies or limited partnerships that pursue direct lending strategies, however,

White Oak has complete discretion as to what investment vehicles it will select."

The IMA also contains the so-called "Most Favored Nations" ("MFN") clause in

Subchapter 9 (c) that reads, in relevant part "[u]nder no circumstances will the fee set forth in

Schedule C result in payment by the Trustees or the Trust of fees exceeding those that White

Oak be payable-for management of assets approximately equal in value to the Investment

Account by any of the Investment Manager's other clients for whom it provides the same or

similar services." In the event that White Oak has an "agreement with another client to provide the same or similar services pursuant to a fee schedule that White Oak produce a lower fee for investing assets approximately equal in value to, or less than, the Investment Account, said fee schedule shall automatically apply to this Agreement and shall supersede the fee schedule set forth in Schedule C."

The Investment Manager's sole discretion included the ability to invest the Plan's assets into funds managed by White Oak, including the Pinnacle Master Fund. The IMA set forth these parameters in Paragraph 11(t): "The Investment Manager expressly acknowledges, represents, warrants and agrees that: whether the Investment Manager invests Account Assets in one or more collective investment funds organized by White Oak Global Advisors, LLC, is within the sole and exclusive discretion of the Investment Manager, provided that investments in the Vehicle shall only be made, or continued, to the extent that such fund(s) are managed in accordance with the provisions of this Agreement, anything in the Vehicle's governing documents to the contrary notwithstanding, and that any such investments shall not: (i) give rise to a non-exempt prohibited transaction for purposes of ERISA; and (ii) violate Section 404 of ERISA."

The IMA was effective as of December 31, 2013 and automatically terminated on December 31, 2015, pursuant to Subchapter 13 (g).

The IMA may be terminated "[a]t any time by the Trustees without penalty by giving the Investment Manager's written notice of such termination date" pursuant to Subchapter 13(c). The IMA could also be terminated or amended "at any time and from time to time and in whole or in part, but only by the mutual written agreement of the Trustees and Investment Manager" pursuant to Subchapter 13 (g). If the Investment Manager wishes to terminate the relationship "[a]t least ninety (90) days prior written notice to the Trustees of such termination date" must be given." Subchapter 13

Subchapter 13 (d) provides that if the Trustees wish to terminate the IMA, they must provide up to 90 days' written notice by White Oak (subject to a six-month extension at the request of the Trustees, pursuant to IMA Subchapters 13(c), (d), (g). When the effective period of the IMA ended, pursuant to Subchapter 13 (b), White Oak's tenure as manager of Plan assets also ended and White Oak was required to "transfer to the Trustees ... all books, records, accounts, cash, securities ... and all other property of the Trustees and the Plan in the Investment Manager's possession." The compensation for White Oak's services were set forth in Section 9 of the IMA.

Section 18 of the Plan states that the parties agreed that "no provision of this Agreement shall be construed so as to violate the applicable provisions of the Plan, Trust Agreement, ERISA (or any regulations promulgated thereto), or the Advisors Act.  In the event of any inconsistency between this Agreement and the Trust Agreement, the provisions of the Trust Agreement shall govern.

In addition, Schedule C of the IMA specifically sets forth the fees that White Oak could earn, such as a performance fee, or "carried interest" of 20% of investment gains that exceeded a hurdle rate of 7.5% measured as of the end of the investment. It reads as follows: "The sole compensation of the Investment Manager for its services rendered hereunder shall be calculated and payable as set forth in Schedule C (attached hereto and made a part hereof)."  Schedule C also includes language regarding certain other fees, such as a "Management Fee," that are payable to the Investment Manager, as follows in relevant part: "The Investment Manager shall receive a semi-annual management fee, payable in advance as of January 1 and July 1 of each year and calculated at the annualized rate of one hundred and thirty-five basis points (1.35%) of the initial Allocated Amount [$80 million]. The management fee shall be prorated for any semi-annual period that is less than a full six (6) months."

**2014-2018 Relationship Between the Parties and their Principals**

On January 10, 2014, CIO Niemie sent a memorandum to the Trustees noting that under the negotiated deal, "White Oak will be retained on a separately managed basis with the option to invest the Plan's funds in feeder funds at their discretion (the minimum commitment is $80 million)" J-8, J-8A. (underscore in the original). Future fund assets were allocated to White Oak pursuant to the IMA, and White Oak reinvested the quarterly dividends into the Pinnacle Fund on January 28, 2014. J-22, J-23, White Oak - 38. White Oak did not request any changes to the substantive provisions of the IMA, so it remained the same, with the exception of effective date and "allocated Amount" identified Schedule B. White Oak-55, J-8A.

CIO Niemie gave written notice to the Plan on Aug 17, 2015 of his intent not to renew his contract, effective March 31, 2016. White Oak-103.

In November 2015, CIO Niemie began corresponding with White Oak's CEO Hakkak through their respective business e-mail accounts, and thereafter through their personal accounts, about matters other than Plan business. C-52. (Niemie wrote to Mr. Hakkak indicating that he was looking forward to an event called "Crab Night" and advised Hakkak that he was "officially winding down from NYSNA but still a little unsure about the future"); C-53 (Niemie thanked Mr. Hakkak "for a fun evening" and asked Hakkak to let him know when he has time to meet again); C-54  (after meeting for dinner and cigars in late November, 2015, Hakkak asks Niemie if he would like to "catch up further ... to brainstorm a bit more"). C-56.

On December 2, 2015, again corresponding via e-mail, Hakkak and Niemie agreed that White Oak arrange for Niemie to meet with White Oak principals at its San Francisco headquarters on December 17 and 18, 2015, and he did so.  C-15.

The following day, on December 3, 2015, CIO Niemie wrote a memorandum to the Trustees recommending renewal of the IMA with White Oak for another two-year period. C-55, C-55A. Two weeks thereafter, the Trustees accepted Niemie's recommendation to renew the IMA with White Oak for two additional years, effective January 1, 2016 and Ms. McKee signed on behalf of White Oak. C-55, C-55A, J-2, J-2A. The January 2016 IMA is identical to the revised 2014 IMA, excepting the effective date and Schedule B. White Oak-587.

At no time during the discussions regarding renewal of the IMA with White Oak, from late 2015 through early 2016, did Niemie or Hakkak, both fiduciaries of the IMA, advise the Trustees that they had been engaging in potential employment discussions once Niemie left the Plan effective March 31, 2016.

On January 28, 2016, CIO Niemie received a draft employment term sheet from McKee which he and White Oak fully executed as of February 6, 2016. C-64, C-65. Under the term sheet provisions, Mr. Niemie was to start his position as Vice-Chairman of White Oak on March 31, 2016, after making a $1 million capital investment to become a partner of White Oak. C-65. It was to be effective on the same day, March 31, 2016, when his contract with the Plan ended.

The Plan and Trustees learned of Niemie's relationship with White Oak when it saw a copy of his updated LinkedIn page. W-103, C-91, C-72,

After Mr. Niemie's contract expired on March 31, 2016, Case Fell became the Plan's CIO effective April 1, 2016. The Plan's Trustees directed Mr. Fell to closely review the investment managers that Mr. Niemie had recommended over the past years. The Plan also launched an investigation into Mr. Niemie's conduct during his time as the Plan's CIO, which revealed alleged undisclosed conflicts of interest. In several instances, there was evidence that Niemie allegedly had falsified expense submissions and time reports. C-91. As a result, on June

14, 2016, the Plan's Personnel/Compensation Committee and Audit Committee informed Niemie that he would not receive a post-termination bonus payment or payments for accrued vacation time. (This arbitration proceeding does not address any potential disciplinary matters involving Mr. Niemie).

### The Findings of Case Fell

Fell testified that he discovered White Oak had been failing to meet certain obligations under the IMA, more specifically, that it had never provided "consolidated reporting" of the Plan's total investment account with White Oak, as required under Paragraph 6 of the IMA. J-1, J-2, J-2A, C-74 and C-74A.  In addition, the "pacing plans" that were required of White Oak as of March 2015 under the revised IMA had not been delivered to the Plan.  Accordingly, on April 11, 2016, the Trustees took Fell's recommendation to restrict White Oak from making additional capital commitments on the Plan's behalf, because the Plan did not wish to continue investing with White Oak until its alleged performance failures were addressed. C-78; C-78A.  White Oak was informed of its probationary status in writing the following day. C-80.

During this period, White Oak continued to call capital from the Plan to fund commitments already made. The Trustees reviewed Fell's findings regarding White Oak and concluded that White Oak's "surreptitious hiring" of Niemie while he was the Plan's CIO, as well as its failures to honor IMA requirements were not isolated improprieties, but rather were part of a consistent practice of White Oak allegedly disregarding its fiduciary and professional obligations to the Plan.

Fell also reported to the Trustees that, contrary to the termination rights that the parties negotiated under the IMA, the Plan's assets were "locked up" into White Oak's funds in LPA subscription agreements.  The Pinnacle Feeder Fund LPA, which was drafted and executed by White Oak pursuant to its discretionary authority, contained a provision that provided an

absolute prohibition against the Plan from withdrawing funds from that Fund, as it stated that the Plan was "not entitled to cancel, terminate or revoke the subscription or any agreements of the [Plan] hereunder." J-23, Section 2(a)."

In addition, the Plan learned that White Oak had unilaterally committed the Plan to indemnifying White Oak against any losses or claims caused by White Oak's own conduct with respect to the subscription funds: "The Partnership will indemnify, to the maximum extent permitted by law, each Covered Person [White Oak, its affiliates, and principals] against any and all claims, liabilities, damages and related expenses, including legal fees, incurred by them by reason of any action performed or omitted in connection with the activities of the Partnership or in dealing with third parties on behalf of the Partnership unless such action or omission is determined pursuant to a final, non-appealable judgment to constitute Disabling Conduct." J-3 Section 9.2(a). The Pinnacle Feeder Fund and Summit Fund LPAs contain materially similar indemnity provisions. J-4 a, Section 9.2(a); J-5 Section 9.2(a). By contrast, the IMA contains no indemnity for White Oak against claims. *See generally.* J-1; J-2; J-2A.

Similarly, Fell reported that the Summit Fund LPA restricted the Plan's ability to withdraw by granting to White Oak the unilateral right to decide not to return the Plan's investment upon a request to withdraw, but instead to convert that investment return into a promissory note to the Plan as follows, in relevant part: "No Voluntary Withdrawal by Limited Partners. A Limited Partner may not voluntarily withdraw in whole or in part from the Partnership prior to its dissolution …on such withdrawal date, the withdrawing ERISA Partner shall be paid the Fair Value of its LP Interest; provided, however, that, at the sole discretion of the General Partner, all or a portion of such payment may be made in the form of a note issued by the Partnership, which note shall bear interest at the rate of eight percent (8%) per annum ... "J-4.

Accordingly, the Plan would be unable to recover its assets either from the White Oak Pinnacle Feeder Fund or the White Oak Summit Fund, LPA despite White Oak's termination of the parties' IMA, as White Oak retained within these subscription agreements the unilateral ability to retain the Plan's assets under its control and management, as well as to continue to collect fees on the Plan's assets.

A few months after the filing of the arbitration demand, White Oak unilaterally amended the withdrawal provisions in the Pinnacle Feeder Fund LPA to deal with any request by the Plan for a "withdrawal" from the Pinnacle Feeder Fund. The Plan could withdraw assets from the fund, but White Oak reserved for itself the right to respond to a withdrawal request by issuing a note from the fund to the Plan, creating an interest-bearing loan, with White Oak continuing to earn fees on the Plan's assets. J-4.

The Trustees found that White Oak had unilaterally committed the Plan to indemnifying White Oak against any losses or claims caused by White Oak's own conduct with respect to the funds, even though the IMA provided for no such rights. For example, the Pinnacle Master Fund LPA states: "The Partnership [White Oak] will indemnify, to the maximum extent permitted by law, each Covered Person [White Oak, its affiliates, and principals] against any and all claims, liabilities, damages and related expenses, including legal fees, incurred by them by reason of any action performed or omitted in connection with the activities of the Partnership or in dealing with third parties on behalf of the Partnership unless such action or omission is determined pursuant to a final, non-appealable judgment to constitute Disabling Conduct." J-3, Section 9.2(a). The Pinnacle Feeder Fund and Summit Fund LPAs contain materially similar indemnity provisions. J-4, Section 9.2(a); J-5 Section 9.2(a). Conversely, the IMA contains no

indemnity for White Oak.

Moreover, as Plan assets were to be invested solely in White Oak funds, White Oak was protected as the parties agreed to a provision in their IMA in Paragraph 18 which contains a "savings clause" and reads that, "No provision of this Agreement shall be construed so as to violate the applicable provisions of the Plan, Trust Agreement, ERISA (or any regulations promulgated thereto)." The subscription agreements have similar savings clauses in J-3, Sections 3.4, 3.11 (precluding investments that White Oak deems non-exempt prohibited transactions); and J-4 Section 3.4, 3.11.

The IMA Investment Guidelines were amended in March 2015 to increase the capital available to invest in White Oak funds. White Oak decided that the Summit Fund was a suitable investment for the Plan. Also, the Plan committed $35 million in Plan assets to the Summit Funds during this time.  White Oak-47. The IMA granted White Oak sole discretion to invest those assets in White Oak funds that met the Plan's investment guidelines, which were private comingled investment vehicles, including investment into White Oak's own funds. The Investment Guidelines amendments also allowed for a percentage of the Plan's assets, rather than a fixed dollar amount, to be committed to White Oak. C-45, 45A. This change resulted in an additional $35 million in Plan assets for White Oak to invest.  White Oak-52.  In addition, the Investment Guidelines included the requirement that White Oak provide a "pacing plan," or an analysis that the Plan intended to use, to track capital calls, distributions, liquidity needs, and to ensure that White Oak maintained the correct percentage allocation over time.  J-2, Sec. III.

In March 2015, the Plan stopped the reinvestment of dividends in White Oak and it was advised that it had been placed on probation.  White Oak-52.

On September 1, 2015, Sean Raleigh, the Plan's Investment Department Manager, raised the issue of renewing the IMA and asked if White Oak would be seeking any substantive changes to the provisions. It responded that it did not wish to make any changes. White Oak-55. On October 7, 2015, the Plan Staff recommended renewal of the White Oak IMA for a two-year period to the Trustees Investment Committee.  White Oak-587.  The Trustees voted to renew it effective January 1, 2016.  C-55. The effective date and the allocated amounts are different from those found in the original IMA, as Schedule B specifically references the Plan assets invested in the Pinnacle and Summit Funds.  J-2, Sch. B.

As part of his overall analysis of the operations of the investment department post-April 1, 2016, Fell reviewed the implementation of the Most Favored Nation, or Section 9 (c). He noted that the management fees charged to the Plan on assets committed to the Pinnacle Feeder Fund were 1.35%, whereas the management fees charged to the Plan on assets committed to the Summit Fund were 1%.  Mr. Fell questioned White Oak representatives in April 2016 as to why the MFN clause was not triggered so as to give the Plan the benefit of the 1% management fee under both funds. White Oak forwarded an explanation to Fell from its outside counsel explaining that the lower Summit fee did not trigger the clause because "the NY Nurses MFN applies to separately managed account clients that have IMAs like New York Nurses." C-83, C-84.

Fell testified that he was advised by the White Oak staff that the MFN clause does not apply to fees charged by specific funds in which White Oak invests an SMA client's assets but rather applies to fees charged by White Oak to the SMA itself under an investment management agreement. Fell said that White Oak's explanation essentially was a logical one because the Plan, as an SMA client, should compare its fee terms to other similar SMA clients.

The Plan's investment plan staff continued to monitor the White Oak account over the

next year and held due diligence meetings with White Oak. At one such meeting in September 2017, according to Fell, Managing Director McKee said that White Oak's SMA clients that invested in the same loans as did the Pinnacle Fund "get preferred fee structures" as compared to what the Plan was paying. C-101. Fell testified such news was "startling" given that during the prior year White Oak had acknowledged in response to the Plan's MFN inquiries that the Plan was an SMA client. McKee's comments led Mr. Fell to ask White Oak to provide information on the fee structures of the other White Oak SMA clients. C-102.

Fell, with the help of the investment staff and external consultants, reviewed the information and concluded that several other SMA clients appeared to have better fee deals than the Plan, and so informed the Trustees. He relied on the language found in IMA Section 9 (c) that reads in relevant part: "[u]nder no circumstances will the fee set forth in Schedule C result in payment by the Trustees or the Trust of fees exceeding those that White Oak be payable-for management of assets approximately equal in value to the Investment Account by any of the Investment Manager's other clients for whom it provides the same or similar services." In the event that White Oak has an "agreement with another client to provide the same or similar services pursuant to a fee schedule that White Oak produce a lower fee for investing assets approximately equal in value to, or less than, the Investment Account, said fee schedule shall automatically apply to this Agreement and shall supersede the fee schedule set forth in Schedule C."

Fell wrote to White Oak on November 16, 2017 and requested what he viewed to be reimbursement of overpaid fees in light of the MFN clause, as he believed it failed to make payment to the Plan for those applicable to other clients of White Oak for whom it provides the same or similar services and who hold assets approximately equal in value to the Plan Investment Account. J-11, J-11A, C-106. White Oak responded via letter dated November 21,

13

2017 maintaining that none of the other SMA clients that Fell had identified triggered White Oak's MFN obligations. C-107.

According to the letters from White Oak and its outside counsel, the Plan was not entitled to the better fee terms that other White Oak SMAs received, because the Plan was receiving an "array of fiduciary services enumerated" under the IMA that purportedly differentiated the Plan from other White Oak SMA clients. C-107. Fell concluded that White Oak did not provide enough information to assess White Oak's assertions, so the Plan scheduled an in-person meeting on December 20, 2017 so that White Oak could "explain every single account and why it didn't apply and make sure that [the Trustees and Fell] could ask [their] questions." Tr. 195:4-11, 562:10-563:4.

White Oak notified the Plan in writing three days before the December 20th scheduled meeting that it was terminating the IMA, subject to the agreement's notice period.  White Oak-91, C-110. White Oak's letter stated that, after the 90-day period, the Plan's assets would remain under White Oak's management and the investment would be governed by the Fund documents, instead of the IMA.   In light of the termination, the Trustees cancelled the December 20th meeting with White Oak.  The Plan exercised its right on December 27, 2017 to extend the IMA for a six-month period or until it selected a successor investment manager.  White Oak-93.

On July 31, 2018, the Trustees filed a demand for arbitration seeking, among other relief, "the withdrawal and return of [the Plan's] investment." C-116. Along with the demand, the Plan's counsel sent a letter to White Oak's counsel stating that the Plan sought "the withdrawal and return of its investment." C-115. The demand for arbitration outlined a number of alleged breaches of fiduciary duty under ERISA.

On September 18, 2018, the six-month extension of the IMA expired and, that same day, White Oak wrote to the Plan indicating that it intended to "treat the IMA as if were still in effect

despite the notice of termination … [and] … [u]nless White Oak receives other instructions from the Trustees, White Oak will maintain the status quo and continue to provide the same services to the Plan, including consolidated reporting at the same fee arrangement as set forth in the Investment Management Agreement and in effect prior to the termination." White Oak-99.

Thus, White Oak continues to hold approximately $88.7 million of the Plan's assets and charges the Plan management fees, while providing the usual financial statements. As of June 30, 2019, the Plan has paid White Oak a total of approximately $5,346,777 in management fees. After the 90-day notice period expired, the Trustees invoked their right under the IMA to extend it for another six months." White Oak-93.


**REASONING AND ANALYSIS**

White Oak has engaged in numerous prohibited transactions pursuant to ERISA Section 406 (b)(1), 9 U.S.C. Sec. 1106 (b)(1) and as a result received either compensation or benefits beyond that agreed to by the Trustees under the IMA. In addition, ERISA Section 406 (b)(1), 29 U.S.C. Sec. 1106 (b)(1) has been violated. White Oak recognizes in its post-hearing brief, "[t]he only issue" for purposes of the Plan's self-dealing claims 'is whether White Oak exercised its fiduciary authority to cause the Plan to pay its fees [and compensation] to which it was not entitled under the IMA or agreed to by [the Trustees]?" Also, "whether that person was acting as a fiduciary when taking the actions subject to complaints." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). If that person was not performing a fiduciary function when taking the action subject to the complaint, then he cannot have breached any alleged fiduciary day. *Id.* at 226, ERISA Sec. 3 (21)(A)(i)

The language of the IMA that governs the relationship between the Plan

and White Oak is clear and unambiguous on its face.  Although the record is

replete with parol evidence concerning the meaning and/understanding of the

various provisions of the IMA, the parsing of each paragraph and subchapter

therein provides a roadmap for assessing the legality of the actions and the ERISA

violations that might have occurred. One of the fundamental principles of contract

construction is that "[t]he best evidence of what parties to a written agreement

intend is what they say in their writing." *Greenfield v. Philles Records, Inc.*, 98

N.Y. 2d 562, 569 (2002).  In this case, the IMA is unambiguously written and

provides much guidance with respect to the parties' intent when it was drafted.

### White Oak's Unilateral Termination of the IMA

In order to begin the analysis of the series of steps that must be taken when

an IMA is terminated, one turns to Paragraph 13, "Amendment and Termination"

that contains the language agreed to by the parties who jointly developed the

explicit procedure for termination of a fund or the IMA itself.  This procedure sets

forth the applicable notice periods to be given by the party declaring the

termination and the various transactions that must be undertaken as a result.  For

example, subchapter 13 (a) provides for the modification or amendment of the

IMA "[b]y the Trustees or the Investment Manager, at any time and from time to

time and in whole and in part, but only by the mutual written agreement of the

Trustees and Investment Manager."  Since this was a unilateral termination by the

Investment Manager, we need to look to the subsections 13 (b), (c) and (d) for the

procedures to be followed when the termination is not mutual.

As is the case with many contracts, the parties jointly agreed to set down

the precise steps to be taken when one side unilaterally decides to terminate the

IMA.  Here, the parties agreed in Subchapter 13 (b) as to the actions to be taken by the Investment Manager following the issuance of the notice of termination: "[W]ithin thirty (30) days of the termination of this Agreement (in accordance with either subparagraphs 13 (c) or 13 (d) hereof), the Investment Manager shall transfer to the Trustees (or their duly authorized representatives) all books, records, accounts, cash, securities (and other evidences of ownership) and all other property of the Trustees and the Plan in the Investment Manager's possession, along with the documents and information required by paragraph 6 hereof as directed by the Trustees or their duly authorized representatives).  The Investment Manager shall continue to cooperate with the Trustees to facilitate the transition of the Investment Account to the management of the Trustees, another investment manager appointed by the Trustees, or any other duly appointed representative of the Trustees."

A plain reading of subchapters 13 (c) and (d) make clear that White Oak had the burden under the IMA, once it notified the Trustees that it was terminating the IMA, to transfer all of the items set forth in subchapter 13(b), without requiring a formal request from the Trustees to do so.  The list of those items to be returned to the Plan included "cash."  It is irrelevant whether the "cash" to be returned is currently encumbered by White Oak's other clients or is not readily available as it is not the Plan's burden to locate the source of such funding. The IMA makes clear that both sides contemplated a possible return of "cash" within a 30-day period following a unilateral termination, such as here, and White Oak must find a way of meeting its contractual obligations, regardless if it takes the form of a market rate loan or other legal means.

In light of the specificity of the items set forth in this paragraph to be

returned to the non-terminating party once a unilateral termination is made, the parties agreed that the items that are to be released "within 30 days" from the custody of the terminating party, in this case White Oak.

White Oak argued that it never received a formal request from the Trustees for a return of the Plan assets.  There is no language in the termination provision of the IMA, however, requiring that the non-terminating party issue such a request, once a unilateral termination of the IMA is made by the Investment Manager, as the Paragraph is self-executing.  As the IMA clearly sets forth, "[a]ll books, records, accounts, cash, securities (and other evidences of ownership) and all other property of the Trustees and the Plan in the Investment Manager's possession, along with the documents and information required by paragraph 6 hereof as directed by the Trustees … The Investment Manager shall continue to cooperate with the Trustees to facilitate …." Accordingly, once a termination is declared, the Investment Manager must execute the return of the items set forth in paragraph 6 within a 30-day period and cooperate with the Trustees to facilitate their transmission.

The Investment Manager or White Oak failed both to automatically return the items listed in paragraph 6 upon its unilateral termination of the IMA, or to begin the proper transition of cooperation with the Trustees to transfer all items, including cash.

Any argument by White Oak that requiring the return of the Plan's money would result in a foreclosure on borrowers was rebutted by McKee's testimony at the hearing that such an action "[is] not the only way for White Oak to get the money." Tr. 1304.  Furthermore, there is no authority to support White Oak's

action of holding Plan assets, especially in light of the self-executing nature of the
post-termination transition language, that White Oak either knew or should have
known that the next step was to return, *inter alia,* the "cash" within 30 days.
Therefore, White Oak failed to recognize its affirmative contractual burden to
execute a return of the Plan's funds as set forth in subchapter 13 to the Plan. Its
failure to do so is a violation of ERISA Section 403 (b)(6); and a prohibited
transaction has occurred as a result.

Moreover, if there had been any question as to the Plan's intent upon the
unilateral termination of the IMA, despite the clear language of Section 13, the
Trustees filed for arbitration for the "withdrawal and return of [the Plan's]
investment" (C-116) pursuant to Section 24, "Resolution of Disputes."  A reading
of the arbitration demand leaves no doubt that the Trustees want a return of all
assets; yet White Oak replied with a letter two months *after* the filing of the Plan's
demand indicating that it would "maintain the status quo" which again is contrary
to the language of the IMA Section 13 (d).  White Oak's unilateral action to
continue to maintain control over the Plan's assets and earn fees is a conferral of
benefits upon itself not approved by the IMA and is in violation of ERISA Section
406 (b)(1), as it caused the Plan to pay White Oak fees that it was not entitled to
receive under the IMA.

The *Leigh* court made clear that "the protective provisions of section 406
(a)(1)(D) and (b)(1) should be read broadly in light of Congress' concern with the
welfare of plan beneficiaries.  "We read those provisions dealing with the use of
plan assets for the benefit of 'parties in interest' and 'plan fiduciaries' as a gloss on
the duty of loyalty required by section 404. … The entire statutory scheme of

ERISA demonstrates Congress' overriding concern with the protection of plan beneficiaries, and we would be reluctant to construe narrowly and protective provisions of the Act." *Id.* at 270.

In addition, "the prohibited transaction rules are designed to prevent the use of plan assets for any interest, financial or nonfinancial, other than an interest of the Plan and its beneficiaries." *Id.*

### Self-Grant of Indemnification Rights in Subscription Agreements

White Oak's action of granting itself indemnification rights within the subscription documents are not consistent with the IMA, as it was aware pursuant to Section 11(t) that any exercise of its sole, discretionary authority was to be consistent with the Plan. Thus, its granting itself such rights was wholly contrary to that provision, as the IMA did not grant any indemnification rights to White Oak in the IMA.

Nor can White Oak rely on some implicit right to indemnification, as argued in its closing, as the explicit language of the IMA must control. Although White Oak possessed the fiduciary authority to enter into subscription agreements under the Pinnacle and Summit Funds on behalf of the Plan, it did not have the right to grant itself benefits that were not consistent with the IMA, which did not grant White Oak any indemnification rights. Thus, White Oak engaged in a prohibited transaction pursuant to ERISA Section 406 (b)(1) when it exercised its discretionary powers to provide indemnification against potential legal liability through the subscription fund documents.

Moreover, White Oak breached its Section 406 (b)(1) duties by designing the Pinnacle and Summit Fund agreements to grant to itself indemnification rights backed by the Plan's assets—a

benefit not agreed to by the Trustees under the IMA.  Furthermore, White Oak's cited cases do not

warrant a different conclusion for they hold only that a person or entity does not become an ERISA

fiduciary merely by failing to take some action or prevent an outcome.  See *Leimkuehler v. Am.*

*United Life. Ins. Co.*, 713 F .3d 905 914 (7th Cir. 2013) (rejecting theory that service provider of

401(k) plan is fiduciary simply by act of omission).

      As the court held in *Leigh*, "the nature of the breach of fiduciary duty alleged here is not the

loss of plan assets but instead the risking of the trust's assets … ERISA expressly prohibits the use

of assets for purposes other than the best interests of the beneficiaries, and the language of section

1109 (a) providing for disgorgement of profits is the appropriate remedy … [and] when measuring

damages … plaintiffs are not required to show that the trust lost money as a result of the alleged

breaches of fiduciary duties …" *Id.* at 122.

      Also, White Oak committed a prohibited transaction by granting itself indemnification

rights in the feeder funds, which placed the trust's assets "at risk . . .at least in part to aid [White

Oak]." *Leigh v. Engle*, 727 F .2d 113, 122 (7th Cir. 1984) (internal citations omitted). Nor would

any attempt to enforce these rights against the Plan constitutes a violation of ERISA because the

IMA contains a savings clause which states that "no provision of [the Parties' IMA] shall be

construed so as to violate the applicable provisions of the Plan, Trust Agreement, ERISA (or

any regulations promulgated thereto).

      I note White Oak's claim it has not taken any action to cause itself to receive any fee to

which it was not already entitled." See e.g., *Santomenno ex. Rel. John Hancock Trust v. John*

*Hancock Life Ins. Co. (U.S.A.,* 768 F .3d 284, 300 (3rd Cir. 2014) (rejecting argument that John

Hancock engaged in prohibited transaction by including unexercised rights in its contracts,

which if exercised could create a prohibited transaction).  However, the issue is not whether

White Oak is entitled to use authority under IMA to grant self-indemnification rights, and not

whether it is simply by an act of omission. Its reliance on the "savings clause" in Fund
agreements is misplaced, as it does not argue that the provisions in the Fund agreements are
ineffective or invalid, undercutting the notion that White Oak believes the clause "could not be
enforced against the Plan."

Also, White Oak claimed it "waived" its indemnity rights against the Plan
by failing to exercise them, but the express terms of Pinnacle and Summit Fund
LPs state that Agreement may be waived but only "by a writing signed by or on
behalf of [White Oak]" which it did not produce. J-3, Sec. 13.1 (a), J-4, Sec. 13.1
(a). (*Leigh* holds that 406(b)(1) "should be read broadly" to include even non-
monetary benefits."). White Oak insisted it "waived" its indemnity rights against
the Plan by "failing to exercise them." Yet, the express terms of the feeder funds
state that they "may be waived" but only "by a writing signed by or on behalf of
[White Oak]." J-3. However, it is clear such rights had not been waived, I
conclude.

### Subscription Agreement Exit Rights

White Oak also violated ERISA Section 406 (b)(1) when it allotted itself
benefits that were not agreed to by the Trustees in the IMA by executing the
Pinnacle and Summit feeder subscription funds pursuant to its fiduciary authority
under the Plan that resulted in its ability to control Plan assets and earn fees on the
assets, despite its termination of the IMA with the Plan. Also, White Oak
imposed exit requirements that were contrary to those found in the IMA.

White Oak argued that the exit provisions of the subscription funds comply
with ERISA because they "[a]re reasonable under the circumstances" citing to 29
U.S.C. Sec. 1108 (b)(2) and 29 C.F.R. Sec. 2550.408b-2 (c)(3). It also maintained

that the Plan's arguments ignore the unique nature of private lending strategies and the higher investment returns the Plan knowingly pursued in exchange for locking up its money.  These arguments, however, are irrelevant as the main issue is whether the terms of the subscription funds are consistent with the provisions of the IMA, as set forth in paragraph 11, and not whether the Plan recognizes the "unique nature of private lending strategies."  They were not, I find.

There is no dispute that White Oak signed Fund agreements and subscription documents on behalf of the Plan that gave it the unilateral right to enter into such agreements.  Such a right was recognized in Section 9 (t) of the IMA that identified the discretionary authority of White Oak to invest in such finds, or to continue such investments,

> "[P]rovided the investments in the Vehicle shall only be made, or continued to the extent such fund(s) are managed in accordance with the provisions of the Agreement, anything in the Vehicle's governing documents to the contrary notwithstanding, and that any such investments shall not: (i) give rise to a non-exempt prohibited transaction for purposes of ERISA … The Investment Manager further acknowledges that the subscription agreements shall not constitute a waiver of any of the obligations White Oak Global Advisors LLC has an Investment Manager under this Agreement."

Accordingly, under its sole and discretionary authority under the IMA, White Oak had the right to invest Plan funds into feeder funds but White Oak's obligation under the IMA was to ensure that any language in a subscription agreement would be consistent with and cause no waiver of the terms of the IMA, such as fund exit rights. This it did not do since the language of the Pinnacle and Summit Feeder funds regarding the Plan's ability to exit are not consistent with the IMA, as the IMA provides the Plan with the right to terminate the IMA "at any time" "without penalty" pursuant to Section 13 (c); and may automatically expire after two years,

whereas the feeder funds require that the Trustees are "[n]ot entitled to cancel, terminate or revoke the subscription" to them.  J-23, Par. 2 (a).

White Oak asserted that the funds' exit provisions are "reasonable under the circumstances" for ERISA Section 406 (a) purposes because if the Plan terminated the fund and ceased paying management fees to White Oak, the latter would cease being a fiduciary to the Plan funds. It also insisted that at no time has the Plan sought to exit the feeder funds, so essentially no harm has occurred. However, White Oak misses the salient point here, which is the exit language of the feeder funds developed by White Oak remains inconsistent with the IMA and serves to "waive the exit rights" found in the IMA.

The feeder fund exit rights provide only for an interest-bearing note of White Oak's making, which is not "reasonable under the circumstances," given the lack of consistency with the language of the Plan.  There should be no need to explain the distinction between the Plan's right to exit White Oak's funds with cash "in hand" as set forth in Section 9 of the IMA after providing a short notice, as opposed to having its funds locked up for an extended period of time in subscription feeder funds that allows it to leave after a 5-7 year period, and then with an interest-bearing note only of White Oak's making. Such a breach is a clear violation of its fiduciary duty under Section 406 (b)(1).

In another deviation from the IMA, which requires a return to the Plan of "all books, records, accounts, cash, securities …" upon termination, the Pinnacle and Summit Fund LPAs grant White Oak the "sole discretion" to refuse to return the Plan's cash and the foregoing itemized assets and instead substitute an interest-bearing note, at a rate of White Oak's determination.

Such a provision is not only inconsistent with the provision in the IMA requiring that the Plan receive all "[c]ash...." upon termination, it would also force the Plan to underwrite a loan to White Oak in the amount of its investment, and to wait for the redemption at a time and a rate set by White Oak. Meanwhile, under the subscription language, the Plan's assets remain under the control of White Oak, which continues to earn fees on the assets and the Plan's bears the attendant credit risk—neither of which are authorized by the Plan's IMA. White Oak has breached its fiduciary duty and is engaged in self-dealing by creating the situation of preventing the Plan from reclaiming its assets and using the funds in a manner not contemplated pursuant to the language of the IMA, which is in violation of section 406 (b)(1).

White Oak's argument that the IMA does not require that it return the Plan's "cash" and "other property" because "the Plan's money is not in White Oak's physical possession" is contrary to the clear and unmistakable language of the IMA. If the Plan's money is no longer in White Oak's possession, then it is incumbent upon it to borrow it, or resort to whatever legal means it might have available to it. White Oak is party to the IMA that allows the Plan to exit with its assets "without notice" pursuant to Paragraph 13 (c). White Oak agreed to the language of the IMA. Thus, it contemplated or should have contemplated the possibility that the Plan could terminate the IMA and exercise its right for a return of assets pursuant to the schedule set forth in the IMA. White Oak has the burden to accommodate the Plan's request accordingly.

White Oak contended that the Pinnacle Feeder Fund LPA that it drafted was terminable on "reasonably short notice" because up until August 31, 2018, it

expressly prohibited the Plan from withdrawing at all.  J-4, Section 10.5   White

Oak confuses this with self-dealing claims, as the Trustees do not contend that

ERISA 408 (b)(2)("reasonably short notice provision") "requires the Plan be

allowed to get its money back upon demand." Rather it is entitled to the return of

its assets as a result of White Oak's self-dealing conduct in violation of ERISA

Section 406 (b)(1)**."**  Sec. LA, IV

Although White Oak maintained that there is a "reasonable exit right" that

should be read into the agreement, the IMA nonetheless controls.  Moreover,

courts do not favor the placement of obligations into a contract that do not exist.

*Murphy v Am. Home Prods. Corp.*, 758 <u>N.Y.2d</u> 293, 304 (1983) (No obligation

may be implied, however, which may be inconsistent with other terms of the

contractual relationship."

**MFN**

While the Plan attempts to justify its failure to raise any ERISA concerns

prior to December 18, 2017 primarily by claiming the Trustees were unaware of

the terms of the Pinnacle and Summit Fund documents, and it may be true that

none of the Trustees read them, they were repeatedly advised of the Pinnacle's

Fund lock-up period; the Fund's agents including counsel were fully aware of the

Pinnacle Fund documents prior to the IMA execution in January 2014 and raised

no concerns; Day One Investor Fee disclosed and highlighted to Plan Staff on

multiple occasions and agreed to by the Plan through its decision to invest in the

Fund and direction to pay the fee from Plan assets; the Plan's accounting managed

by the Plan's CEO received the capital calls relating to the Day One Investor Fee

and paid it out of Plan Assets; that the Pinnacle Fund had a five year lock-up

period J-6 which Hakkak specifically emphasized during his presentation to the

Trustees on November 15, 2013 and included on his term sheet. J-6.

Furthermore, the record reveals that the Fund has repeatedly admitted that it cannot prove

its claim for alleged breach of the MFN provisions of the IMA but seeks an advisory opinion

from the Arbitrator as to a possible, future state of events.  Given these factors and the Plan's

acknowledgment that "a calculation of the effect of the MFN cannot yet be made" and that "the

exact amount of damages cannot currently be calculated," I find that the Plan has not met its

burden in establishing a violation of the MFN.  This is due to the fact that the language contained

in the MFN results in the scenario now facing the Plan; to essentially request that this Arbitrator

identify and then declare which of the SMAs are comparators for purposes of the MFN so a

calculation can be made sometime in the future to determine if the MFN is triggered as to the

evidence that the Plan has paid "significantly less" than the SMAs which cannot be shown

because the Plan will not pay its performance fee until the end of the investments, while the

SMAs pay annually.

Thus, the Plan's request for a declaration from this Arbitrator as to those

plans it claims are similarly situated and to order that a calculation be made once

the total fees are paid by the Plan to determine if the MFN is triggered is denied.

**The Day One Investor Fee**

There is a substantial dispute with respect to the issue of whether White

Oak is entitled to the so-called "Day One Investor Fee" for that time prior to the

execution of the fund in December 2013. One of White Oak's managing partners,

Barbara McKee, was questioned as to whether she could identify any provision in

Schedule C that specifically permits White Oak to assess and receive fees for time

periods prior to the effective date of the execution of the IMA on December 31,

2013 and she responded "no, I cannot." Tr. 1255. Yet White Oak continued to assert that the IMA authorized the Day One Investor Fee, relying on Schedule C for support.

The IMA does not authorize payment of a Day One Investor Fee because it does not contain explicit language "preclud(ing) a fee for White Oak for services it provided prior to the effective date of the IMA." Furthermore, the IMA states, "The sole compensation of the investment manager for its investment services rendered hereunder shall be calculated and payable as set forth in Schedule C ..." Section 9 (a). In addition, White Oak could not have provided any fiduciary services before the IMA was in effect. Moreover, it would be difficult to interpret a fee provision in a contract to cover periods before the contract was ever in effect, absent clear and unambiguous language to the contrary. See *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp*, 595 F .3d 458 (2d Cir. 2010) ("[A] court should not find the contract ambiguous where the interpretation urged by one party would strain the contract language beyond its reasonable and ordinary meaning.").

White Oak insisted that the Plan's investment in the Pinnacle Fund "necessarily triggered the Day One Investor Fee provision." But the terms of the IMA, and not the Fund terms, control and govern the conduct of White Oak. The Trustees did not provide written consent to the retroactive fee under the IMA when they "reviewed approved and paid the fee invoice for the fee." But the IMA expressly prohibits it from collecting fees or compensation beyond that specified in the IMA unless it has the "prior express written consent of the Trustees." Section 9B.

Although White Oak argued that the Plan should treat its mid-level staffers as "agents" with authority to bind the plan to act on behalf of the Trustees, it offered no authority for the proposition that the knowledge of staff is imputed to the trustees of an ERISA pension plan. Nor could they legally be regarded as "agents" "with the power to affect the legal rights and duties between the

principal and third parties." *Mouawad Nat. Co. v. Lazare Kaplan Int'l Inc.*, 476 F. Supp. 414, 422 (S.D.N.Y. 2007). "

I agree with the Plan's contention that White Oak attempts to develop a "direction defense" whereby it claims that it was not acting as a fiduciary and that the Trustees directed White Oak investment decisions, which is contrary to the explicit language found in IMA Paragraph 1(c) that provides for White Oak's "accept[ing] the appointment and delegation and agree[d] to assume sole, exclusive and full discretion and authority to invest plan assets."  White Oak also "expressly acknowledge[d], represent[ed], warrant[ed], and agree[d] that: It is an 'investment manager'(as that term is defined in Section 3 (38) of ERISA of the Trust with respect to the asset of the Trust at any time constituting the Investment Account "… and "It is a 'fiduciary' (as that term is defined in Section 21 (A) of (ERISA) of the Trust with respect to the Plan and the assets of the Trust at any time constituting the Investment Account …." and that "Whether (White Oak) invests … in one or more collective investments funds organized by White Oak … is within the sole and exclusive discretion of [White Oak).  IMA, Paragraph 11 (a)(b)(t).  Thus, any claim the Trustees had any power to direct the Investment Manager is misplaced.  For these reasons, this Arbitrator concludes White Oak's Day One Investment Fee payment arguments must be rejected.

 It is clear that the IMA embodies the parties' agreement in which White Oak agreed and warranted that it was a fiduciary "at any time" with respect to the Plan's assets and that the decision "whether" to invest in its own funds, including the Pinnacle Funds, was within its "sole and exclusive discretion."  Such unambiguous language makes clear that White Oak did not take "direction from the Fund's Trustees with respect to Pinnacle investment."

### Indemnity Rights

Case law supports the Plan's contention it did not "direct" the Investment Manager in the management of funds.  In *Lowen v. Tower Management*, 829 F 2d. 1209, 1218 (2d Cir. 1987), the

court's analysis turned on whether the IMA was explicitly granting the sole and absolute

discretionary powers to the investment managers to manage the funds.  In that case, the court

dismissed "without legal merit" the claim that the trustees extra-contractual "direction" could alter

the parties written agreement and absolve the manager of liability under ERISA. *Id.*" Under

ERISA, an investment manager's fiduciary obligations may not be turned on or off like running

water.  ERISA's purpose of clearly locating legal obligations will be vitiated if plaintiffs are

required to engage in an after-the-fact sorting-out of actions, statements and states of minds among

possible fiduciaries to determine which is legally responsible." Id. at 11219.

White Oak argued that if the indemnity rights have not been enforced against the Plan, then

it has not received a benefit to which it was not entitled to under the IMA, and thus did not engage

in a prohibited transaction under ERISA 406 (b)(1).  But the Plan noted White Oak did not cause a

breach in fiduciary duties not because it caused a loss in plan assets by enforcing the clause; rather,

it breached its duties by granting itself an indemnification right, thereby "risking … the trusts'

assets at least [in part] to aid White Oak."  *Leigh v Engle*, 727 F .2d 113, 122 (7th Cir.1984).

Furthermore, this Arbitrator finds that White Oak cannot escape liability by arguing that the

Trustees "knew" about the features of the Pinnacle Plan because "whether (an investment manager)

breached his fiduciary duties does not turn  …  on whether trustees knew or should have known of

[the manager's] actions and acquiesced therein, but rather on whether [the manager] himself acted

in accordance with the duties imposed by ERISA." *LaScala v. Scrufari,* 479 F .3d 213, 220 (2d Cir.

2007).

Here, the Trustees rejected the concept of directing investing during the initial pitch from

White Oak's Hakkak because they did not wish to assume fiduciary responsibility and authority but

rather wanted an experienced, outside investment manager to assume such a role. Nor was the Plan

willing to sign on to the IMA that was to invest only $50 million and agreeing to the requirement

that they accept fiduciary and responsibility for making investment decisions. The Trustees were willing to increase the investment to $80 million (after one year) and agreed to move to a separately managed account with White Oak thereafter. Despite White Oak's presentment of Niemie's testimony with respect to the intent of the IMA and the Trustees regarding the Pinnacle Fund, it should be noted he had an interest in the outcome of this case, given his equity position with White Oak. Accordingly, White Oak's claim that it is indemnified for violations of the IMA or ERISA is denied.

## COUNTERCLAIMS

White Oak's attempt to hold Trustees liable for its own breaches of fiduciary duty fails because the Plan seeks only the return of assets and fees that White Oak improperly charged. See *Haddock v. Nationwide Financial Services, Inc.*, ("where complete relief can be afforded by requiring the fiduciary that received the payments to return them contribution principles do not apply") 570 F. Supp. 2ds 355, 364 (D. Conn. 2008); see also *Restatement (2d) of Trusts* ("where one of trustees receives a benefit from the breach of trust, the other is entitled to indemnity from him to the extent of the benefit")("the loss should ultimately be borne by the trustee who is more at fault."

In this context, there has been no showing that Plan Trustees breached any fiduciary duties and that all violations arise solely from White Oak's 'acts or omissions' with respect to the management of Plan assets. Under ERISA and Second Circuit case law, trustees are not liable for acts or omission of their investment managers ("Sec. 1105-(d)(1) where investment manager is 'appointment under section 1102 -c-3-of this title, then … no trustee shall be liable for the acts or omissions of such investment manager…or be under an obligation. To invest or otherwise manage any asset of the plan which is subject to the management of such investment manager.") *Lowen*, 829 F .2d at 1219 (trustees cannot be held liable for any act or omission of [an]

investment manager so far as the assets entrusted to the manager are connected."}

Nor, as White Oak suggested, could Trustees still be liable by "participating in the breach, enabling the breach and failing to take reasonable and timely measure to remedy the breach." Section 1105 (a)(1)-(3) ("where investment manager … [has] been appointed under section 1102 (c)(3) per Section 1 (a). ERISA Section 405 (d) expressly eliminates any potential liability to trustees for 'enabling such other fiduciary to commit a breach" and failing to "make [ ] reasonable efforts … to remedy the breach."  Section 1105-(d)(1). A trustee would only be potentially liable for the acts and omissions of an investment manager if she "participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach." Section 1105 (a)(1). There was no demonstration of any breach by Plan Trustees.

A trustee also would be liable if she had personal, actual knowledge that she was participating an investment manager's breach of fiduciary duty, as knowledge cannot be imputed to a trustee in a fiduciary matter. *Harris v Finch, Pruyn & Co.Inc.*, 2008 WL 2064972, at *8 (S.D.N.Y. May 13, 2008) ("In ERISA co-fiduciary cases, an agent's knowledge cannot be imputed to the principal.")  White Oak failed to identify any trustee who had actual knowledge of White Oak breaches of fiduciary duty and who nevertheless "participat[ed]" in that breach.  Nor does the record support any such claim. There was sufficient evidence of record to support such a conclusion.

Thus, any claim by White Oak that there is contributory liability by the trustees is based on mischaracterization of facts and has no bearing on the Plan's claims against White Oak and is not relevant to any claim of contribution.  Also, this is the same argument contained in the counterclaim pleading, which this Arbitrator ruled on by Order dated June 12, 2019 and thus cannot be said to assert a standalone claim for breach of fiduciary duty against the Trustees.

**EQUITABLE ARGUMENTS/RELIEF**

White Oak maintained that the Plan should be precluded from raising any claims with respect to the Day One fees.  It asserted that the Plan failed to include any claim in its Amended arbitration demand and is procedurally blocked from doing so at this point.  Moreover, it argued that it would be unduly prejudiced if the Plan were allowed to proceed with its evidence on this issue.

The Plan responded that although the issue was not specifically mentioned in its demand or amended demand, the AAA Commercial Rule 4 (c)(iv) stands for the proposition that it is not necessary to allege every final detail of claims and that the "nature of the claims" and the "relief sought" is sufficient to proceed in an arbitration.  It also pointed to FRCP 8 (a)(2) and cited to *Skinner v Switzer*, 562 US 521, 530 (2011), all that is required in a pleading is a "plausible and short statement of the claim" and not an explanation of a legal argument.  The Plan contended that it is not introducing a new legal claim but rather is refining those that were raised in the original complaint.  Moreover, it argued, White Oak has demonstrated that it is well-prepared to address the Day One fee, the subject of this objection, as it explained in its pre-hearing motion and letters, as well as its conduct probing the issue at the hearing.

The Plan insisted the courts have set forth the criteria for precluding claims and that White Oak must demonstrate the following: (1) a material misrepresentation (2) a reliance on the action and (3) damages.  *Walker v Prudential Ins. Co. of Am.*, 19 Civ. 7286, 2020 WL 978515 * 3 (S.D.N.Y. Feb. 28, 2020).  It contended that equitable estoppel is available for ERISA claims in extraordinary circumstances only, citing to Walker at *3, and there must be the presence of intentional inducement or written/oral interpretation of an ambiguous term where circumstances are beyond the ordinary, which are not relevant here.

White Oak raised the issue of the Plan IRS Form 5500 submission to the Department of

33

Labor ("DOL") and argued that it should be granted judicial estoppel given that the Plan had been "dishonest" as it now claims that there had been prohibited transactions in violation of ERISA but never reported them to the DOL.  The Plan argued that such an equitable remedy is a "rare one" as it is not required to affirm that a prohibited transaction has occurred when such a determination remains contingent on the outcome of this instant arbitration, citing to *Am. Mfr. Mut. Ins. Co. v. Payton Lane Nursing Home*, 704 F. Supp 2d 177, 192 (E.D.N.Y. 2010) (rejection by court of judicial estoppel defense when the defendant "had not established plaintiff required to report a contingent liquidated damages claim on tax return"). The *Payton* court also found that the "applicable accounting rules further support the plan's position that it was not required to reports its liquidated damages claim in its 2006 tax return… (thus) right to receive such payment in 2006 was far from certain."

DOL 2018 Instructions for Form 5500 state that "if you are unsure whether a transaction is exempt or not, you should consult with either the plan's independent qualified public accountant or legal counsel or both." Schedule G Form 5500 at 32.  Plan management concluded, as testified to by CEO Lamy, that because White Oak's violations were contested," It would not have been appropriate to disclose th[ose] allegations … until such time that this [arbitration] is complete." The Plan auditors reviewed the 5500 and advised the Plan that it need not affirm on its 5500 filing that a prohibited transaction had occurred because "there certainly could be a negative impact to the Plan" had the Plan "made an allegation that turned out to be false." Tr 626. The Plan also argued that no prior court or agency "adopted" the Form 5500, so no judicial estoppel need apply, citing *Bates v. Long Island,* 704 F. Supp. 2d at 197, 201 (regulatory guidance and accepted accounting principles may be used to report contingent liquidated damages claim on tax return).  This Arbitrator agrees with this interpretation, as the making of unfounded allegations is not only problematic but could be actionable.

To be granted equitable estoppel, White Oak must show that the Plan adopted a "factual position clearly inconsistent with an earlier one, that the prior position was adopted by the court in the earlier proceedings, and that the plaintiffs would derive an unfair advantage against defendants in asserting inconsistent statements." *Welfare Fund, New Eng. Health Care Emps., v Bidwell Care Cir. LLC.*, 419 Fed. App'x 55, 59 (2d Cir 2011). Here, there has been no showing of an earlier adoption of the Plan's position by a court or in an earlier proceeding. Thus, White Oak's counterclaim must be denied.

## RELIEF

White Oak breached its fiduciary duties under the IMA and ERISA which is recognized by the relief afforded.  In order to develop an accurate account of the scope of the damages, however, an ERISA attorney or accountant shall be jointly selected by the parties and, if unable to do so, by this Arbitrator, at the parties' joint expense, with jurisdiction retained by this Arbitrator over the collateral proceeding, to review all aspects of the funds that will be subject to the actions set forth below as a result of the prohibited transactions and/or breaches of fiduciary duties under the IMA and ERISA:

1. ***Disgorgement of Assets/Fees/Profits:*** The IMA specifically set forth the procedure to be followed once White Oak declared its withdrawal from the IMA, yet it failed to do so. Rather, it has maintained custody over the Plan's assets and charges fees for asset maintenance, contrary to both the IMA and ERISA.  The Plan must be granted the NAV of its investments, the disgorgements of profits, and any fees White Oak collected, including all Day One Fees, from the time White Oak first collected any fees from the Plan until the date that assets are returned to the Plan. White Oak is to restore to the plan

any profits … made through use of assets of the plan." *Lowen*, 829 F .2d at

1221. If White Oak placed Plan assets and other compensation into companies

in which they owned equity interests, the inquest should reveal such conduct.

*Severstadl Wheeling, Inc. Ret. Comm. v. WPN Corp.* 119 F. Supp. 3d 340, 269

(S.D.N.Y. 2105) (necessary to disgorge to make plan whole). Moreover,

White Oak is not entitled to continue to charge and retain fees for services

provided after its termination of the IMA on 9/18/18. An ERISA fiduciary is

not entitled to extract fees from Plan not explicitly authorized by the Trustees,

then claim innocence because it provides "services." Such an amount shall be

calculated by the outside ERISA attorney or accountant in order to determine

the proper amount for disgorgement.

2. ***Removal as Fiduciary/Investment Manager of the Plan's Assets:*** In light of the

numerous prohibited transactions it has engaged in, as well as breaches of the IMA, as

set forth in the foregoing partial final award, White Oak must be removed as

investment manager. This shall occur upon the Plan's retention of a replacement

investment manager.

3. ***The Plan's Attorneys' Fees*** : The Plan's attorneys shall have thirty (30) days to

submit an attorney fee application to both this Arbitrator and opposing counsel for

comment. Attorneys' fees are granted because, by statute, the Plan achieved at least

*"some* success" on the merits. *Hardt v Reliance Standard* Life *Ins. Co*., 560 U.S. 242,

254 (2010). Since awarding fees, I need "not consider any other factors" beyond

whether the Trustees have demonstrated "some degree of success on the merits." *Doe

v. Unum Life Ins. Co. of Am*., 12 Civ. 9327, 2016 WL 335867 at *1(S.D.N.Y. Jan. 28,

2016) (internal cites omitted); see also *Donachie v. Liberty Life Assur. Co.*, 754 F .3d

41, 47 (2d Cir.2014) ("it is well-established that Congress intended the fee provisions of ERISA to encourage beneficiaries to enforce their statutory rights … [G]ranting a prevailing plaintiff request for fees is appropriate absent some particular justification for not doing so."). As to the awarding of prejudgment interest, it shall be set at the New York State nine percent (9%) rate, as courts in this circuit routinely award New York's nine-percent statutory rate in ERISA cases." *Doe*, 2016 WL 3335867, at *10 (internal citations omitted).

## PARTIAL FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with Section 21, "Resolution of Disputes," of the Investment Management Agreement entered into by the above parties dated December 31, 2013, and having been duly sworn and having duly heard the proof and allegations of the parties on December 16, 2019 through December 20, 2019, at the American Arbitration Association, 140 East 42nd Street, New York, New York, issue this PARTIAL FINAL AWARD as follows:

DATED: Nov. 30, 2020

STATE OF NEW YORK

_____
ROSEMARY A. TOWNLEY, ESQ.
ARBITRATOR

STATE OF NEW YORK          )
                           S.:
COUNTY OF NEW YORK         )

I, ROSEMARY A. TOWNLEY, ESQ., do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument, which is my PARTIAL FINAL AWARD.

STATE OF NEW YORK          )
                           S.:
COUNTY OF NASSAU           )

ON THIS 30th DAY OF Nov. 2020, Rosemary A. Townley, Esq. APPEARED BEFORE ME, WHO EXECUTED THIS INSTRUMENT, WHICH IS HER PARTIAL FINAL AWARD.

DATED: November 30, 2020

_____
HOWARD C. EDELMAN, ESQ.
NOTARY
No. 02ED4780153
Commission Expires 1/31/21