# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
THE TRUSTEES OF THE NEW YORK STATE
NURSES ASSOCIATION PENSION PLAN,

<div style="border:1px solid">
**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:**_____
**DATE FILED:** 3/17/2022
</div>

                                    Petitioner,


                    -against-                                        21-cv-8330 (LAK)


WHITE OAK GLOBAL ADVISORS LLC,


                                    Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# MEMORANDUM OPINION


Appearances:


                C. William Phillips
                Clea Liquard
                Jonathan Michael Sperling
                COVINGTON & BURLING LLP
                *Attorneys for Petitioner*


                Thomas K. Cauley
                James Ormerod Heyworth
                Steven E. Sexton
                SIDLEY AUSTIN, LLP
                *Attorneys for Respondent*


LEWIS A. KAPLAN, *District Judge.*

        This action is before the Court on the petition of the Trustees of the New York State

Nurses Association Pension Plan to confirm an arbitration award and respondent White Oak Global

2

Advisors LLC's motion to vacate that award.

*Facts*

The New York State Nurses Association Pension Plan (the "Plan") manages approximately $4 billion for the oldest union of registered nurses in the United States. White Oak Global Advisors LLC ("White Oak") is a private investment manager that the Plan's Trustees retained to manage certain Plan assets pursuant to an investment management agreement effective December 31, 2013. The following facts are drawn principally from the Arbitrator's Partial Final Award ("PFA") of November 30, 2020[1] and Final Award ("FA") of August, 4, 2021.[2] The Court "is not empowered to second-guess the arbitrator['s] fact-finding or assessment of credibility"[3] and "must accept findings of fact if they are not clearly erroneous."[4]

*The Parties' Contractual Relationship*

In early 2013, the Plan, through its then-Chief Investment Officer ("CIO") Russell Niemie and members of its investment staff, began searching for outside investment managers specializing in the fixed income market. Niemie identified White Oak, and the parties entered into

---

[1]    Dkt. 11 Ex. B [hereinafter "PFA"].

[2]    Dkt. 11 Ex. A [hereinafter "FA"].

[3]    *Acciardo v. Millennium Sec. Corp.*, 83 F. Supp. 2d 413, 417 (S.D.N.Y. 2000) (citing *Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 706, 725-26 (2d Cir. 1998)).

[4]    *Id.* (citing *ConnTech Dev. Co. v. Univ. of Conn. Educ. Props.*, 102 F.3d 677, 686 (2d Cir. 1996)).

3

a two-year investment management agreement ("IMA"), effective December 31, 2013.  The IMA gave White Oak "sole and exclusive investment supervision and management" over the Plan's allocated investment, initially $80 million.[5]

The IMA vested White Oak with "sole, exclusive and full discretion and authority to invest plan assets."[6]  This included authority to commit those assets to "collective investment funds organized by White Oak," such as White Oak's "Pinnacle" subscription fund.[7]  The IMA relieved the Plan's Trustees of "any obligation to invest or otherwise manage the Investment Account Assets."[8]  The scope of White Oak's discretion was limited only by the terms and conditions of the IMA (including written "Investment Guidelines" reflecting the Trustees' investment objectives, restrictions, and policies), compliance with the Employee Retirement Security Income Act of 1974 ("ERISA") and other applicable law, and the Plan's enumerated fee schedule.

With respect to fees, the IMA provided that "[t]he sole compensation of the Investment Manager for its services . . . shall be calculated and payable as set forth in Schedule C."[9]  In relevant part, Schedule C provided for compensation of (1) "carried interest" equal to 20 percent of investment gains exceeding a 7.5 percent per annum floor (as measured at the end of the

---

[5]   Investment Management Agreement (hereinafter "IMA") (Jan. 6, 2014), Dkt. 11 Ex. C, at 1-2.

[6]   *Id.* at 2.

[7]   *Id.* at 2, 33.

[8]   *Id.* at 3.

[9]   *Id.* at 21.

4

investment) and (2) a semiannual "management fee" at the annualized rate of 1.35 percent of the initial allocated amount of $80 million.[10]

       The Trustees retained the right to terminate the deal "[a]t any time . . . without penalty" by giving White Oak written notice of the termination date.[11]  Upon termination, the IMA obligated White Oak to "transfer to the Trustees . . . all books, records, accounts, cash, securities . . . and all other property of the Trustees and the Plan."[12]

       In late 2015, as the IMA was set to expire, Niemie and White Oak's Chief Executive Officer, Andre Hakkak, began a series of undisclosed employment discussions.[13]  On December 2, 2015, following various meetings and correspondence in November between Niemie and Hakkak on matters "other than Plan business," the two agreed that the Niemie would meet with White Oak principals at its San Francisco headquarters on December 17 and 18, 2015.[14]  On December 3, 2015, Niemie transmitted a memorandum to the Trustees recommending that the Plan renew its IMA with White Oak for another two-year period.  The Plan adopted his recommendation, and the renewed IMA took effect on January 1, 2016.  Soon thereafter, Niemie executed an employment contract to become vice chairman of White Oak.[15]  The Arbitrator later found that "[a]t no time during the

---

[10]    *Id.* at 46-47.

[11]    *Id.* at 35.

[12]    *Id.*

[13]    PFA at 6-7.

[14]    *Id* at 6.

[15]    *Id* at 7.

5

discussions regarding renewal of the IMA with White Oak, from late 2015 through early 2016, did Niemie or Hakkak, both fiduciaries of the IMA, advise the Trustees that they had been engaging in potential employment discussions . . . ."[16]

Upon Niemie's departure, the Trustees initiated an investigation into his conduct as CIO, which "revealed allegedly undisclosed conflicts of interests" and "evidence that Niemie allegedly had falsified expense submissions and time reports."[17]  The Trustees also ordered the Plan's new CIO to review investment relationships that Niemie had recommended to the Plan.

In the course of that review, the Plan's investment staff identified a number of potential performance failures under the IMA.  Notably, they found that White Oak had locked up Plan assets in White Oak subscription funds using agreements that abrogated rights under the IMA.  In December 2017, after considerable back-and-forth between the parties over fees, White Oak informed the Plan of its intention to terminate the IMA and retain the Plan's assets under management pursuant to the subscription fund documents as distinguished from the IMA.  The Plan thereafter exercised its right to extend the IMA for six months or until it selected a successor investment manager, whichever came earlier.

On July 31, 2018, the Plan filed a demand for arbitration seeking, among other relief, "withdrawal and return of its investment."[18]  The six-month IMA extension expired on September 18, 2018.  That same day, White Oak informed the Plan that it would continue to treat the IMA as "still in effect despite the notice of termination," stating also that "[u]nless White Oak receives other

---

[16]     *Id.*

[17]     *Id.*

[18]     PFA at 26.

6

instructions . . . White Oak will maintain the status quo and continue to provide the same services

to the Plan . . . at the same fee arrangement as set forth in the [IMA]."[19]


*The Arbitration*

Pursuant to the IMA's dispute resolution provision, the dispute was arbitrated in New

York City under the rules of the American Arbitration Association. In the November 30, 2020 PFA,

the Arbitrator found that White Oak, in its fiduciary capacity, engaged in "numerous" prohibited

ERISA transactions, causing itself to receive benefits to which the parties had not agreed.[20]

The PFA describes several independent ERISA violations and breaches of fiduciary

duty by White Oak. The first set of violations concerns White Oak's failure to return Plan assets

upon termination of the IMA. The Arbitrator determined that White Oak's failure to return the Plan

assets upon termination of the IMA violated ERISA Section 403(b). She rejected White Oak's

argument that its failure to return the assets was excused by the Trustees' lack of action in response

to White Oak's September 18, 2018 notice of intent to "maintain the status quo," observing that

"[t]here is no language in the termination provision . . . requiring that the non-terminating party issue

such a request . . . as the Paragraph is self-executing."[21] She concluded also that White Oak's

unilateral action to preserve control and continue earning fees after termination of the IMA--and

after the Plan's arbitration demand for the return of its investment--was "a conferral of benefits upon

---

19

     *Id.* at 14-15.

20

     *Id.* at 15.

21

     *Id.* at 18.

7

itself" in violation of ERISA Section 406(b)(1).[22]

Next, the Arbitrator found that White Oak violated ERISA by granting itself indemnification rights through the subscription agreements. She concluded that granting such rights to itself was "wholly contrary" to the IMA, which vested in White Oak exclusive authority over investment decisions without the benefit of indemnification. Concluding that White Oak placed the Plan's assets "at risk . . . at least in part to aid [White Oak]," she determined that this was a prohibited ERISA transaction regardless of whether White Oak ultimately could have enforced those rights against the Plan.

Similarly, the PFA concluded that White Oak violated ERISA Section 406(b)(1) by using the subscription agreements to impose investment exit requirements contrary to the IMA.[23] The Arbitrator held that although the IMA gave White Oak discretionary authority to commit Plan assets to White Oak's feeder funds, it obligated White Oak to ensure also that any such subscription agreement would "be consistent with and cause no waiver of the terms of the IMA, such as fund exit rights."[24] She concluded that

> "[t]here should be no need to explain the distinction between the Plan's right to exit White Oak's funds with cash "in hand" as set forth in Section 9 of the IMA after providing a short notice, as opposed to having its funds locked up for an extended period of time in subscription feeder funds that allows [sic] it to leave after a 5-7 year period, and then with an interest-bearing note only of White Oak's making.

---

[22]

    *Id.* at 19.

[23]

    29 U.S.C. § 1106(b)(1) ("A fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account.").

[24]

    PFA at 23.

8

Such a breach is a clear violation of its fiduciary duty under Section 406 (b)(1)."[25]

Lastly, the Arbitrator determined that White Oak violated ERISA by causing the Plan to pay a "Day One Investor Fee," as the IMA expressly prohibited White Oak from collecting any fee or compensation not enumerated in Schedule C without "prior express written consent of the Trustees." She concluded that the "Day One Investor Fee" was unlawful even though the Plan's mid-level investment staff knew of and paid that fee. And she declined to interpret the IMA's fee provision as authorizing any compensation "for periods before the contract was ever in effect."[26]

In sum, the PFA declared that "White Oak breached its fiduciary duties under the IMA and ERISA"and awarded relief under three headings, listed here for convenience:

> "**1. *Disgorgement of Assets/Fees/Profits:*** The IMA specifically set forth the procedure to be followed once White Oak declared its withdrawal from the IMA, yet [White Oak] failed to do so. Rather, it has maintained custody over the Plan's assets and charges fees for asset maintenance, contrary to both the IMA and ERISA. The Plan must be granted the [net asset value ("NAV")] of its investments, the disgorgements of profits, and any fees White Oak collected, including all Day One Fees, from the time White Oak first collected any fees from the Plan until the date that assets are returned to the Plan. White Oak is to restore to the plan any profits . . . made through use of assets of the plan. If White Oak placed Plan assets and other compensation into companies in which they owned equity interests, the inquest should reveal such conduct. Moreover, White Oak is not entitled to continue to charge and retain fees for services provided after its termination of the IMA on 9/18/18. An ERISA fiduciary is not entitled to extract fees from Plan not explicitly authorized by the Trustees, then claim innocence because it provides 'services.' Such an amount shall be calculated by the outside ERISA attorney or accountant in order to determine the proper amount for disgorgement.

> "**2. *Removal as Fiduciary/Investment Manager of the Plan's Assets:*** In light of the numerous prohibited transactions it has engaged in, as well as breaches of the IMA, as set forth in the foregoing partial final award, White Oak must be removed as investment manager. This shall occur upon the Plan's retention of a replacement

---

[25]

    *Id.* at 24.

[26]

    *Id.* at 27-29.

investment manager.

**"3. *The Plan's Attorneys' Fees*:** The Plan's attorneys shall have thirty (30) days to submit an attorney fee application to both this Arbitrator and opposing counsel for comment. Attorneys' fees are granted because, by statute, the Plan achieved at least '*some* success' on the merits. . . . As to the awarding of prejudgment interest, it shall be set at the New York State nine percent (9%) rate, as courts in this circuit routinely award New York's nine-percent statutory rate in ERISA cases."[27]

The PFA was "partial" in that the Arbitrator determined that further fact-finding would be required "to develop an accurate account of the scope of damages."[28] Accordingly, the Arbitrator retained jurisdiction for a "collateral proceeding" to review "all aspects of funds subject to the actions set forth [in the PFA] as a result of the prohibited transactions and/or breaches of fiduciary duties."[29] To determine the scope of damages, the parties were invited to "jointly select[]" an ERISA attorney or accountant, although White Oak "refused to participate in this aspect of the order" and challenged the Arbitrator's authority to appoint an expert to determine damages.[30]

The Arbitrator issued the FA on August 4, 2021. At the outset, it addressed several new claims by White Oak, including that the Arbitrator committed "procedural error when she addressed the issues of this case in two steps, by first deciding the case on the merits [in the PFA] and then moving on to damages and attorneys' fees and costs [in the FA]."[31] The Arbitrator dismissed those procedural arguments and declined to repeat "[t]he reasons governing the finding

---

27  
      *Id.* at 35-37 (citations omitted).

28  
      *Id.* at 35.

29  
      *Id.*

30  
      FA at 7.

31  
      *Id.* at 6.

that [White Oak] must disgorge all assets," which are "more fully set forth in the [PFA] (appended)."[32] She noted also that "certain areas of the PFA [were] modified to update the award," particularly since "both parties presented expert witnesses on the issue of damages, which clarified the questions presented, especially around the applicability of statutory construction."[33]

After declaring that the PFA "is hereby incorporated within this final award," the FA awarded the following additional relief:

> "2. WHITE OAK shall disgorge the NAV of the Plan, which may not include all cash, as of date of this FINAL AWARD. Disgorgement, including interest, shall take place no later than 30 calendar days after the issuance of this Award unless the parties agree otherwise.

> "3. PERFORMANCE FEES shall be retained by White Oak and not be returned to the Plan as they constitute reimbursement for managing the business and affairs of Pinnacle and Summit, rather than profits of White Oak.

> "4. ATTORNEYS' FEES AND COSTS as proposed by the Plan, shall be reduced by 20% since the Plan did not prevail on all claims, notably the Most Favored Nation claim. No interest shall be paid with respect to attorneys' fees and costs owed. Payment of attorneys' fees and costs shall be rendered no later than 30 calendar days from this AWARD.

> "5. PRE-JUDGMENT INTEREST is awarded at the New York statutory rate of 9%.

> "6. The TOTAL of all Plan assets as of May 19, 2021 is $96,213,778.83.

> "7. The administrative fees and expenses of the American Arbitration Association totaling $40,600.00 are to be borne $20,300.00 by the New York State Nurses Association Pension Plan and $20,000.00 by the White Oak Global Advisors, LLC.

> "8. The compensation of the Arbitrator totaling $169,325.00 shall be borne equally.

---

[32]     *Id.*

[33]     *Id.* at 8.

"9. All claims not expressly granted herein are DENIED."[34]

White Oak now moves to vacate the arbitration award, arguing that the Plan "did not achieve any success on the merits"[35] and that "[i]f anything, White Oak should have been awarded its attorneys' fees as the prevailing party."[36]

## Discussion

### Legal Standard

In this Circuit, arbitration awards are subject to "very limited review" to "avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."[37]  An award should be confirmed so long as there is a "barely colorable justification" for the outcome that the arbitrator reached, even if the Court "disagree[s] with it on the merits."[38]

There are four grounds on which an arbitration award may be set aside: (1) "corruption, fraud, or undue means," (2) "evident partiality or corruption in the arbitrator[]," (3) "arbitrator . . . misconduct in refusing to postpone the hearing . . . or in refusing to hear evidence

---

34
     *Id.* at 10-11.

35
     Dkt. 12 at 30.

36
     *Id.* at 26.

37
     *Rich v. Spartis*, 516 F.3d 75, 81 (2d Cir. 2008) (quoting *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir.1997)) (internal quotation marks omitted).

38
     *Landy Michaels Realty Corp. v. Local 32B–32J Serv. Employees Int'l*, 954 F.2d 794, 797 (2d Cir. 1992).

12

pertinent and material to the controversy,"or (4) the arbitrator "exceeded [her] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made."[39] Atop these four discrete grounds is a "judicial gloss" that contemplates vacatur where an award was rendered "in manifest disregard of the law."[40] Satisfying this standard has been described as a "heavy burden" that requires "more than error or misunderstanding with respect to the law."[41]

Judicial confirmation of an arbitration award is considered "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court."[42] The Federal Arbitration Act permits the court to modify or correct an arbitration award where there has been "an evident material mistake in the description of any person, thing, or property referred to in the award" or where it is "imperfect in matter of form not affecting the merits of the controversy."[43]

A district court "has the power to remand an award for clarification of 'the meaning or effect of an award.'"[44] However, remand to an arbitrator is not appropriate where the court can

---

[39]    9 U.S.C. § 10(a)(1)-(4).

[40]    *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 340, 346 n.10 (2d Cir. 2010); *cf. Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 94 (2d Cir. 2008), *rev'd and remanded on other grounds*, 559 U.S. 662 (2010) (explaining that "manifest disregard" does not amount to a fifth ground for vacatur "separate from those enumerated in the [Federal Arbitration Act]").

[41]    *T.Co Metals, LLC*, 592 F.3d at 339 (citations and internal quotation marks omitted).

[42]    *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir.1984)).

[43]    9 U.S.C. § 11(a), (c).

[44]    *Gerlind Global Reins. Corp. v. Yasuda Fire & Marine Ins. Co. Ltd.*, No. 98-cv-9185 (LAP), 1999 WL 553767, at *1 (S.D.N.Y. July 29, 1999) (quoting *Siegel v. Titan Indust. Corp.*, 779 F.2d 891, 894 (2d Cir.1985)).

resolve any alleged ambiguities in the award by modification.[45]

*Incorporation of the Partial Final Arbitration Award*

As a threshold matter, the parties disagree emphatically as to the relationship between the November 30, 2020 PFA and the August 4, 2021 FA. The Plan argues that the FA incorporates fully the PFA except where modification is explicit. White Oak rejoins that the FA in effect superseded the PFA. It maintains that the Arbitrator abandoned her earlier liability findings because she "did not find [in the FA] that White Oak breached its fiduciary duties or committed any ERISA violations."[46] White Oak insists that "[b]ased on that new evidence and legal argument, the Arbitrator adopted White Oak's positions" in the Final Award such that the Plan ultimately had "no success on the merits."[47]

On its face, the FA expressly "incorporate[s]" the PFA.[48] It also addresses--and ultimately rejects--White Oak's procedural challenge to the Arbitrator's authority to issue such an award in two stages. At the same time, the Arbitrator made clear that the FA modifies the PFA in material respects. The parties' disagreement owes in large measure to the following paragraph in the FA:

---

[45]

See *Fischer v. CGA Comput. Assocs., Inc.*, 612 F. Supp. 1038, 1041 (S.D.N.Y. 1985); *Est. of Scherban v. Lynch*, No. 14-CV-6312 (VSB), 2021 WL 2581278, at *12 (S.D.N.Y. June 23, 2021).

[46]

Dkt. 12, at 19.

[47]

*Id.* at 8.

[48]

FA at 10 ("The PARTIAL FINAL AWARD dated November 30, 2020 is hereby incorporated within this FINAL AWARD.").

14

"The findings in the PFA were 'partial' in that all evidence had not been presented concerning several areas, as evidenced by the subject matter of the arguments contained in the briefs post-PFA. Also, both parties presented expert witnesses on the issue of damages, which clarified the questions presented, especially around the applicability of statutory construction. As a result, there are certain areas of the PFA that have been modified to update the award, to reflect the evidence revealed throughout the briefing and the experts presented during the post-PFA period. That evidence demonstrates that White Oak unsuccessfully attempted in writing to return the Funds to the Plan after the 6-month holding period. White Oak notified the Plan it would continue investing the money in the same manner and for the same charges as before and until such time that the Plan advises White Oak of its successor investment manager or when it is ready to receive the funds itself. White Oak should not be penalized for the Plan's lack of action in notifying the Fund that it had a new investment manager or some other means of handling its funds, though it was clear that it was unhappy with White Oak at that time."[49]

At the outset, the FA notes that the PFA "le[ft] the decision regarding the issues of Damages [] and Attorneys Fees and Costs [] to be addressed thereafter in this instant Final Award."[50] This is consistent with the text of the PFA, which recognized the need for a "collateral proceeding" to "develop an accurate account of *the scope of the damages* . . . as a result of the prohibited transactions and/or breaches of fiduciary duties under the IMA and ERISA."[51]

While the Plan itself concedes that "not all of the precise amounts awarded to the plan are apparent" in the wake of the collateral proceeding,[52] nothing on the face of either award component suggests that any of the FA's "modifications" go to liability – rather than to the *amounts* to be awarded. Indeed, the FA emphasizes that "[t]he reasons governing the finding that [White

---

[49] FA at 8-9.

[50] *Id.* at 8.

[51] PFA at 35 (emphasis added).

[52] Dkt. 18, at 1.

15

Oak] must disgorge all assets, and some fees, and profits, are more fully set forth in the [PFA] (appended)" and do not bear repeating.[53]

There is no proper basis for concluding that the PFA's liability determinations were disturbed by the FA, which expressly incorporates them.  White Oak's endeavor to twist the above-quoted paragraph into a ruling that White Oak ultimately prevailed on all substantive issues in the arbitration is without merit, and the Court considers the aggregate findings and relief set forth in both the PFA and FA in ruling on the parties' instant motions.

*Component Relief*

The Court takes the disputed facets of the award in turn.

*Disgorgement of Plan Investment NAV*

In the final section of the PFA titled "RELIEF," the Arbitrator determined that "[t]he Plan must be granted the [net asset value] of its investments, the disgorgements of profits, and any fees White Oak collected from the time White Oak first collected any fees from the Plan until the date that assets are returned to the Plan."[54]  The PFA indicates that "[s]uch an amount shall be calculated by the outside ERISA attorney or accountant" in the collateral proceeding.[55]

The FA, however, revised that relief.  It requires White Oak to disgorge "all assets, and *some* fees, and profits," clarifying further that the return of the investment's NAV need not be

---

[53]     FA at 6.

[54]     PFA at 35.

[55]     *Id.*

16

"all cash" and should reflect the assets' value "as of [the] date of this Final Award."[56]  The FA states

also, in the final section titled "AWARD," that "the TOTAL of all plan assets as of May 19, 2021

is $96,213,788.83."[57]

> The parties disagree principally on two basic issues.  The first is whether the FA
>
> awards disgorgement of $96,213,788.83.  The second is the extent to which the asset transfer may
>
> be effected by in-kind distribution as opposed to in cash or other property.
>
> The Plan contends that "the only plausible reading of the Final Award . . . is that the
>
> arbitrator ordered White Oak to disgorge the Plan's assets valued at $96,213,778.83."[58]  White Oak
>
> argues that this reading is untenable because (1) the net asset value of Plan assets was "considerably
>
> less than $96 million" as of the date of the date of the FA, and (2)  the FA indicates that White Oak
>
> "should not be penalized for the Plan's lack of action in notifying the Fund that it had a new
>
> investment manager."[59]
>
> One might assume that the Arbitrator's purpose in issuing the award in two
>
> component parts was to determine, through an expert inquest, a discrete sum of damages.
>
> Nevertheless, the FA orders the Plan to disgorge the net asset value of Plan assets "as of [the] date
>
> of the FA" – that is, August 4, 2021.[60]  While the FA announces separately that "the TOTAL of all

---

[56]     FA at 6, 10 (emphasis added).

[57]     PFA at 11.

[58]     Dkt. 32, at 16.

[59]     Dkt. 39, at 1.

[60]     White Oak argues that the Court should not confirm an award of disgorgement of $96,213,788.83 because "the NAV of Plan's investments was considerably less than $96

plan assets as of May 19, 2021 is $96,213,788.83," converting that observation into an order of this Court would direct neither party to do anything. The Arbitrator's decision not to award a discrete sum following substantial briefing and expert testimony on this issue is perhaps not a model of decisional economy, but the ultimate relief is clear nonetheless.

It would be improper for the Court to speculate at this stage as to the relative ease or difficulty of ascertaining the Plan assets' net asset value as of August 4, 2021 or any disputes that may arise upon enforcement of the judgment. To confirm an arbitration award is merely to turn it into an enforceable judicial order; anticipated noncompliance is immaterial to the instant motions.

The second issue concerns the permissible form(s) of disgorgement. White Oak argues that the Arbitrator "order[ed] . . . the Plan to accept an in-kind distribution no later than September 3, 2021."[61] The Plan maintains that the award requires that "some amount of the Plan's assets . . . be returned in cash," but adds that "the disgorgement, in whatever form, must not leave any assets with White Oak or permit White Oak to continue serving as the Plan's investment manager."[62] In arriving at this view, the Plan insists that the FA's language that the disgorgement need not be "all" cash "must also be read in light of the other relief awarded, including the order

---

million as of the date of the Final Award" and thus a judgment ordering White Oak to return that amount "cannot properly be characterized as a 'disgorgement,' because it exceeds the value of the assets the Plan had invested with White Oak as of the date of the Final Award." White Oak argues further that "the Arbitrator specifically found that White Oak should not be penalized for failing to make the in-kind distribution earlier" and thus to "award the Plan more than the value of its White Oak investment as of the date of the Final Award would constitute such a penalty." Dkt. 39, at 5-6. These arguments are unpersuasive, and in any event would require the Court to find facts with respect to the NAV of Plan assets as of the date of the FA that were not before the Arbitrator and are not properly before the Court on these motions.

[61]    Dkt. 12, at 34.

[62]    Dkt. 32, at 12.

18

directing White Oak's removal as a fiduciary and investment manager."[63]

Of course, remedies under ERISA, by design, are tethered to the terms of the operative agreements in respect of which the statutory obligations arise.  As the Supreme Court has noted, a remedy under ERISA "arises from and serves to carry out a contract's provisions . . . holding the parties to their mutual promises and declining to apply rules . . . at odds with the parties' expressed commitments."[64]   Indeed, the "focus on the written terms of the [agreement] is the linchpin" of ERISA's statutory scheme.[65]

Here, the Arbitrator properly framed the award against the backdrop of the IMA, which provided that White Oak would "transfer to the Trustees . . . all books, records, accounts, cash, securities (and other evidences of ownership) and all other property of the Trustees and the Plan in [White Oak's possession]" upon termination of that agreement.[66]  In light of this provision of the IMA, it would have been inappropriate for the Arbitrator to award disgorgement in "all cash," just as it would have been inappropriate to allow White Oak to devise in-kind distributions inconsistent with the IMA.

It is plain also that the Arbitrator did not order the in-kind distribution that White Oak

---

[63]

*Id.*

[64]

*U.S. Airways v. McCutchen*, 569 U.S. 88, 98-101 (2013) (describing ERISA's "principal function" as "protect[ing[ contractually defined benefits").

[65]

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013).

[66]

IMA § 13(b).

19

had in mind.[67]  During the final stage of the Arbitration, White Oak requested that "the Award [] be

clarified so that it . . . make[s] clear that an in-kind transfer of the Plan's investments to the Plan

satisfies the Award's finding that the Plan is 'granted the NAV of its investments.'"[68]   It then

submitted to the Arbitrator that its proposed in-kind transfer "would include fractional shares in debt

securities of the [subscription] Funds," i.e., the same funds in which investment of Plan assets

constituted ERISA violations.[69]  The Plan, in response, objected to White Oak's "propos[al] to

transfer to the Plan formal title to the Plan's *fractional ownership* in each loan" that the relevant

White Oak subscription funds had made to small and mid-market businesses.[70]  Rejecting White

Oak's proposed transfer, the Arbitrator instead ruled that White Oak may be forced to find liquidity

to satisfy its disgorgement obligation: "it is irrelevant whether the 'cash' to be returned is currently

encumbered . . . or is not readily available as it is not the Plan's burden to locate the source of such

funding."[71]

     The award establishes that White Oak cannot satisfy its obligation through an in-kind

distribution of fractional interests in instruments that it controls and that flow from the prohibited

ERISA transactions although in-kind distribution is not precluded categorically.  Under such an

---

[67]

     The Court may look upon the evidentiary record of an arbitration proceeding only for the limited purpose of "discerning whether a colorable basis exists for the panel's award." *Wallace v. Buttar*, 378 F.3d 182, 193 (2d Cir. 2004).

[68]

     Dkt. 11, Ex. L, at 2.

[69]

     *Id.* at 22.

[70]

     Dkt. 11 Ex. H, at 7.

[71]

     FA at 9-10.

arrangement, White Oak would remain in control of both the Plan assets that were the object of White Oak's self-dealing and of the management and disposition of the loans underlying the in-kind distribution. The award cannot be read to permit that result, as it plainly would contradict other portions of the award[72] and, more fundamentally, perpetuate misconduct that the Arbitrator determined to be an ERISA violation. More than that, it would fail to vindicate the terms of the IMA, which necessarily is the object of an ERISA remedy. Thus, there is no reason to vacate or modify the arbitration award as to disgorgement, which must occur in a manner that is consistent with both the IMA and the award as a whole.

*Management, Performance, and "Day-One" Fees*

The FA's most significant "modification" of the PFA concerns the fees that White Oak may retain. The PFA orders White Oak to disgorge "profits, and any fees,"[73] whereas the FA

---

[72]

For example, the award orders White Oak's "removal as fiduciary/investment manager of the plan's assets" in light of "the numerous prohibited transactions it has engaged in, as well as breaches of the IMA." PFA at 36. As the Plan observes in its briefing, returning the NAV in fractional equity interests of entities that are managed by or affiliates of White Oak would fail to extricate Plan assets from White Oak's functional direction and control. White Oak rejoins that the FA "nowhere orders that White Oak be 'removed as fiduciary/investment manger of the Plan's assets'"and that the PFA ordered White Oak to remain the Plan's investment manager until the Plan found a replacement. Dkt 39 at 8. But the PFA states only that White Oak's removal "shall occur upon the Plan's retention of a replacement investment manager." PFA at 36. To the extent this can be read to as ordering White Oak to remain the Plan's investment manager, there can be no serious question that its purpose is to facilitate a transition. It does not invite White Oak to retain substantial control over assets that it improperly committed in the course of what that same paragraph identifies as "numerous prohibited transactions" and "breaches of the IMA." *Id.*

[73]

PFA at 35.

orders disgorgement of "all assets, and *some* fees, and profits."[74]

On its face, the FA provides that "PERFORMANCE FEES shall be retained by White Oak and not returned to the Plan as they constitute reimbursement for managing the business and affairs of Pinnacle and Summit, rather than profits of White Oak."[75] This wording presents a facial ambiguity. While it permits White Oak to retain "performance fees," it describes those fees as "reimbursement for managing the business and affairs of Pinnacle and Summit, rather than profits of White Oak."[76] As White Oak observes in its papers, IMA Schedule C does not use the term "performance fees."[77] Instead, the IMA provides for (1) a fixed "management fee" and (2) a "carried interest," which kicks in only if returns exceed a certain floor. While it is theoretically possible that *both* the management fee and performance fee comprise the "profits of White Oak," the award conceives of the relevant fee category as entirely separate from "profits." Hence, the FA's description of the fees that White Oak may retain cannot plausibly refer to the IMA's "carried

---

[74]   FA at 6 (emphasis added).

[75]   *Id.* at 10.

[76]   *Id.* at 10.

[77]   White Oak argues also that it has not received "any fees based on performance" and thus there are "no performance fees for White Oak to retain." Dkt. 12 at 32. While White Oak characterizes this point as "undisputed," the Plan argues that "White Oak accrued performance fees and deducted them from the reported net asset value of the Plan's assets on a quarterly basis." Dkt. 35 at 20. These arguments were substantially before the Arbitrator, whose award makes no discernible finding on this point. Because the FA awards disgorgement "as of [the] date of the FA," the Arbitrator would not have known, at a minimum, whether any performance-based compensation accrued during the months between the parties' submissions and the date the FA was issued. Thus, even if it is true that White Oak has collected no carried interest, this does not give rise to an "evident material mistake" in the Arbitrator's description of the fees White Oak should retain. 9 U.S.C. § 11(a).

22

interest" provision. While the FA and PFA elsewhere refer to the "carried interest" compensation as a "performance fee," it is clear from the IMA's fee structure that only the "management fee" can be characterized as baseline compensation for "managing . . . business and affairs"–in other words, for services rendered irrespective of returns. By contrast, the "carried interest" provision's 7.5 percent floor makes it difficult to imagine a scenario in which that interest, if earned, would not represent "profits" to White Oak.

The Arbitrator's conclusion that White Oak should be allowed to retain fees that reflect "reimbursement for managing . . . business and affairs . . . rather than profits" also finds some support in Second Circuit case law on disgorgement of management fees under ERISA. In *Lowen v. Tower Asset Mgmt., Inc.*,[78] the Circuit declined to order disgorgement of management fees earned under an IMA because "[ERISA] Section 408(c)(2) provides that Section 406 shall not be construed to prohibit any fiduciary from receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of [the fiduciary's] duties with the plan."[79] These motions do not permit relitigation of whether some or all of the services contemplated in the IMA in fact were rendered, and, if so, whether the IMA management fee represents reasonable compensation for those services. Because the intent of the Arbitrator is apparent and there is at least a barely colorable justification for allowing "some fees" to remain with White Oak, the Court cannot vacate that result even if it does not "[]agree with it on

---

[78]
     829 F.3d 1209 (2d Cir. 1987).

[79]
     *Id.* at 1216 (quoting 28 U.S.C. § 1108(c)(2)) (internal quotation marks omitted).

23

the merits."[80]

Accordingly, the Court concludes that because the Arbitrator made an "evident material mistake in the description of . . . property referred to in the award" by using the term "performance fee" where it has in fact described the IMA's "management fee," the Court should correct the award to resolve the ambiguity.[81] Thus, the Court confirms the award to the extent it orders White Oak to disgorge "profits"[82] and "some fees,"[83] and corrects the FA by substituting the term "management" for "performance" in the first line of the third enumerated item under the heading "AWARD" on the tenth page.

Finally, it is obvious that White Oak may not retain any "Day One" fees. The Arbitrator determined that causing the Plan to pay those fees was a standalone ERISA violation, as the IMA unambiguously disallowed that compensation and because the Trustees did not consent otherwise in writing.[84]

### Attorneys' Fees and Costs

White Oak challenges the award of attorneys fees on the ground that the Arbitrator

---

[80]

Landy Michaels Realty Corp. v. Local 32B–32J Serv. Employees Int'l, 954 F.2d 794, 797 (2d Cir. 1992); cf. Wallace, 378 F.3d at 189 (holding that a motion to vacate "Is not an occasion for de novo review of an arbitral award").

[81]

9 U.S.C. § 11(a).

[82]

PFA at 35.

[83]

FA at 6 (modifying PFA at 35).

[84]

See PFA at 27-29.

24

acted "in manifest disregard of the law" in awarding them. Specifically, White Oak argues that the fee award should be vacated because the Plan "failed to have *any* success" on the merits, "failed to show that its attorneys' fees were reasonable" and submitted invoices that demonstrate "a severe lack of billing judgment."[85] White Oak seeks also to vacate the Arbitrator's award of "costs" to the extent it includes "expert fees and other expenses . . . not recoverable under ERISA as a matter of law."[86]

Each of these arguments is without merit. For reasons already stated, the Plan plainly achieved far more than "some degree of success" on the merits, which is all that is required to support a discretionary award of attorneys' fees under ERISA.[87] ERISA fee provisions "must be liberally construed to protect the statutory purpose of vindicating employee benefit rights."[88] As the Arbitrator herself noted, she need not have considered any other factors beyond whether the Plan had at least "some" merits success to award attorneys' fees.[89] Of course, the Arbitrator's rationale also "need not be explained."[90] The award should be confirmed so long as "a ground for the

---

[85]

Dkt. 12, at 28-32.

[86]

*Id.* at 32-33.

[87]

*See* 29 U.S.C. 1132(g)(1); *Donachie v. Liberty Life Assur. Co.*, 745 F.3d 41, 46 (2d Cir.2014) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 254–55 (2010)).

[88]

*Scarangella v. Grp. Health, Inc.*, 731 F.3d 146, 155 (2d Cir.2013) (citations and internal quotation marks omitted).

[89]

*See Doe v. Unum Life Ins. Co. of Am.*, No. 12CIV9327LAKAJP, 2016 WL 335867, at *1 (S.D.N.Y. Jan. 28, 2016), *report and recommendation adopted*, No. 12 CIV. 9327 (LAK), 2016 WL 749886 (S.D.N.Y. Feb. 23, 2016).

[90]

*D.H. Blair*, 462 F.3d at 110.

25

arbitrator's decision can be inferred from the facts of the case."[91]

With respect to reasonableness, White Oak cannot here relitigate issues that were before and resolved by the Arbitrator. The Plan presented evidence that the fees and costs requested by the Plan were "actually paid by the Plan on an ongoing basis throughout the arbitration, with no guarantee that the Plan would prevail . . . or that the Plan would recover its expenses."[92] The Circuit has held that a reasonable hourly rate is simply that which "a reasonable, paying client would be willing to pay."[93] As the Plan notes in its briefing, actual payment "is prima facie evidence of the reasonableness of the amount as a whole (beyond just the reasonableness of the hourly rates charged)."[94] Moreover, White Oak offers no persuasive authority to suggest that the Arbitrator acted in manifest disregard of the law as to hourly rates, which in this case ranged up to $1,750 per hour. In this district, partner billing rates in excess of $1,000 routinely are upheld as reasonable, particularly within the context of complex commercial litigation.[95] As to both hourly rates and work performed, White Oak's objections to the awarded attorneys' fees have not established that the

---

91

    *Id.*

92

    Dkt. 35, at 32.

93

    *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 184 (2d Cir. 2008).

94

    *Diplomatic Man, Inc. v. Nike, Inc.*, No. 08 CIV. 139 (GEL), 2009 WL 935674, at *6 (S.D.N.Y. Apr. 7, 2009).

95

    *See, e.g., U.S. Bank Nat'l Ass'n v. Dexia Real Est. Cap. Mkts.*, No. 12-cv- 9412 (PAE), 2016 WL 6996176, at *8 (S.D.N.Y. Nov. 30, 2016); *Ballinasmalla Holdings Ltd. V. FCStone Merch. Servs., LLC*, No. 18-cv-12254 (PKC), 2020 WL 814711, at *4 (S.D.N.Y. Feb. 19, 2020); *cf. Fields v. Kijakazi*, No. 20-3760-cv, 2022 WL 258499, at *3-*7 (2d Cir. Jan. 28, 2022) (overturning a district court's fee reduction in a Social Security disability appeal and holding that *de facto* hourly rate of $1,600 was not unreasonable).

Arbitrator "actually knew of–and intentionally disregarded–the law."[96]

Nor may the Court vacate the award as to expert fees or other costs. White Oak cites two cases for the proposition that under ERISA, "expert fees are not recoverable as a matter of law."[97] The Plan cites three different cases for the proposition that "courts have frequently awarded expert fees and other routine litigation costs" in ERISA actions.[98] As it stands, however, "[d]istrict courts within the Second Circuit have split on the question of whether expert fees are recoverable under ERISA . . . and the Second Circuit has not spoken on this question [since 1987]."[99] Accordingly, because there is no "well defined, explicit, and clearly applicable law" on the scope of fees recoverable, the Court cannot vacate this aspect of the award for manifest disregard of the law.[100]

---

[96] *D.H. Blair*, 462 F.3d at 111 (citations and internal quotation marks omitted). White Oak argues also that the Plan "failed to provide invoices with its initial fee petition," "improperly submitted heavily redacted invoices," and impermissibly submitted invoices "for the first time in its reply" during the arbitration. *See* Dkt. 12, at 30-32. Those arguments are, in essence, a claim that the Arbitration proceeding was fundamentally unfair with respect to the issue of attorneys' fees. While Arbitrators are not bound by the federal rules of evidence or procedure, they must afford a fundamentally fair hearing. *See Bell Aerospace Co. v. Local 516, Int'l United Auto.*, 500 F.2d 921, 923 (2d Cir.1974) But there is nothing in the record here to suggest that White Oak did not have a full opportunity to be heard on or to object to those portions of the Plan's fee invoices which it had a right to see, especially considering that White Oak does not dispute that it was granted a surreply after receiving the Plan's invoices. *See* Dkt. 21 ¶ 14.

[97] Dkt. 12, at 32-33.

[98] Dkt. 35, at 33-34.

[99] *Amara v. Cigna Corp.*, No. 3:01-CV-2361 (JBA), 2018 WL 6242496, at *5 (D. Conn. Nov. 29, 2018)

[100] *D.H. Blair*, 462 F.3d at 110-11.

The award of eighty percent of the Plan's attorneys fees and costs was not an "egregious impropriety on the part of the arbitrator[]" warranting vacatur. It must be confirmed.

*Pre-Judgment Interest*

White Oak seeks vacatur of the award as to prejudgment interest because "White Oak, not the Plan, prevailed at the arbitration." Prejudgment interest under ERISA rests firmly within discretion of the Court or Arbitrator taking into account "(I) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court."[101] For substantially the same reasons that it cannot vacate the award of attorney's fees, the Court cannot override an award of prejudgment interest that is supported by the Plan's considerable success on the merits. Nor can it vacate the award for awarding that interest at the New York 9 percent statutory rate. The award is confirmed as to prejudgment interest.

The Court declines, however, to award the Plan post-award prejudgment interest. Although an award of prejudgment interest is not, as White Oak suggests, a "penalty,"[102] the reasons underlying the Arbitrator's revisions to the PFA counsel against such an award here.

*Declaratory Relief*

Finally, the Plan seeks a declaratory judgment that (1) White Oak breached its

---

[101]
    *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000) (citations omitted).

[102]
    Dkt. 12, at 34.

fiduciary duties, (2) that the Trustees did not breach their fiduciary duties, and (3) that White Oak be removed as the Plan's fiduciary and investment manager. White Oak argues that a declaratory judgment would be inappropriate here because "[a] court cannot enter judgment pursuant to a petition to confirm granting relief that was not awarded in the arbitration."[103] White Oak observes correctly that those portions of the FA and PFA setting out "relief" are silent as to any declaratory relief.

It is true that the Court, on these motions, has no grounds for ordering relief beyond that which appears on the face of the arbitration award. It is true also, however, that the Arbitrator's liability findings speak for themselves. In no uncertain terms, the award declares that White Oak "breached its fiduciary duties under the IMA and ERISA," committed "clear violation[s]" of ERISA Section 406(b)(1), and engaged in "numerous" prohibited transactions in its fiduciary capacity. It also denied White Oak's counterclaim that attempted to hold the Trustees liable for their the Trustees' alleged breaches of fiduciary duty, concluding that "there has been no showing that Plan Trustees breached any fiduciary duties and that all violations arise solely from White Oak's 'acts or omissions' with respect to the management of Plan assets."[104] And as discussed above, the award orders White Oak's "removal as fiduciary/investment manager of the plan's assets" in light of "the numerous prohibited transactions it has engaged in, as well as breaches of the IMA."[105]

The Court need not do more than confirm the award and its liability findings at this stage. Should a genuine dispute arise as to the parties' rights upon enforcement of the judgment,

---

[103]  Dkt. 12, at 25.

[104]  PFA at 31.

[105]  *Id.* at 36.

29

the Court will address it in due course.

*Conclusion*

For the foregoing reasons, White Oak's motion [Dkt. 10] is granted to the very limited extent that the award is modified as described about solely with respect to White Oaks' retention of the IMA management fee and denied in all other respects.

The Plan's petition to confirm the arbitration award, consisting of the PFA and the FA [Dkt. 14] and as modified by the preceding paragraph, is granted in all respects. The Plan's requests for post-award prejudgment interest and for a declaratory judgment are denied, the latter as moot. The Clerk shall enter judgment and close the case.

SO ORDERED.

Dated:        March 17, 2022

_____

Lewis A. Kaplan
United States District Judge