UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE TRUSTEES OF THE NEW
YORK STATE NURSES
ASSOCIATION PENSION PLAN,

                 Plaintiff,

– against –

ANDRE HAKKAK *and* BARBARA MCKEE,

                 Defendants.

**OPINION & ORDER**

22-cv-5672 (ER)

Ramos, D.J.:

    The Trustees of the New York State Nurses Association Pension Plan ("the Trustees") bring this action against Andre Hakkak and Barbara McKee (collectively, "Defendants"), alleging Defendants violated several provisions of the Employee Retirement Security Act ("ERISA"). Doc. 1. Before the Court is Defendants' motion to compel arbitration. Doc. 30. For the reasons set below, Defendants' motion is GRANTED.

I.   BACKGROUND

    A. Factual Background

    The New York State Nurses Association Pension Plan ("the Plan") is an employee pension trust administered under the laws of the State of New York. Doc. 1 ¶¶ 1, 6. The Plan provides the principal source of retirement income for members of New York's largest union of registered nurses. *Id.* ¶ 1.

    Defendants are Andre Hakkak and Barbara McKee, who are co-founders of White Oak, a private investment firm. *Id.* ¶¶ 2, 7–8. Hakkak is White Oak's chief executive officer, and McKee is its managing partner. *Id.* ¶ 2.

*1. The Investment Management Agreements*

In November 2013, Hakkak met with the Plan's representatives in New York to pitch the Plan on investing in White Oak's funds. *Id.* ¶ 12. As part of the pitch, Hakkak explained that White Oak would use the Plan's investment to make loans to small and medium sized companies. *Id.* The loans would lead to realized returns for the Plan's investors based on the interest collected on the loans. *Id.*

Following Hakkak's presentation, the Trustees entered into an Investment Management Agreement ("IMA") with White Oak on December 31, 2013. *Id.* ¶ 13. McKee signed the IMA on behalf of White Oak.[1] *Id.* The IMA's term was two years with an initial investment of $80 million. *Id.* ¶ 14. As an investment manager, White Oak had certain "fiduciary responsibilit[ies] . . . including the sole, exclusive and full discretion and authority to invest plan assets . . . in one or more [v]ehicles consistent with the provisions of" the IMA and ERISA. *Id.* As portfolio managers, under ERISA, Defendants owed the Plan certain fiduciary responsibilities "because they (a) exercised 'discretionary authority or discretionary control' over management and disposition of the Plan's assets, (b) 'render[ed] investment advice for a fee,' and (c) had discretionary authority or responsibility in the administration of the Plan." *Id.* (citing 29 U.S.C. § 1002(21)(A).

After the execution of the IMA, Defendants invested in a White Oak controlled investment vehicle, the Pinnacle Fund LP, via the Pinnacle Feeder Fund. *Id.* ¶ 15. A year later, the Trustees approved an amendment to the IMA that committed an additional $35 million to be invested by White Oak. *Id.* ¶ 16. At Defendants' direction, these additional funds were invested in the Summit Fund LP, another fund controlled by White Oak. *Id.*

The Pinnacle and Summit Funds ("the Funds") investments each required the execution of a Limited Partnership Agreement ("LPA") and accompanying subscription

---

[1] Neither McKee nor Hakkak are individually parties to the IMA.

2

documents, all of which were signed by Defendants without the signature of any of the Plan's Trustees, officers, or employees. *Id.* ¶ 17.  Both LPAs set requirements on how the Funds would manage the $80 and $35 million investments, including irrevocably committing the investments to White Oak since the LPAs "locked up" the Funds.[2]  *Id.* ¶¶ 17, 38, 40, 44.

As the IMA was set to expire in 2015, White Oak and the Trustees began discussions to renew the IMA. *Id.* ¶¶ 18, 23.  Around the same time, unknown to the Trustees, Defendants courted the Plan's chief investment officer, Russell Niemie, to join White Oak. *Id.* ¶ 19.  On December 3, 2015, Niemie wrote to the Trustees recommending that they renew the IMA for another two years. *Id.* ¶ 22.  On the basis of Niemie's recommendation, the Trustees signed a new IMA, which became effective on January 1, 2016 ("the 2016 IMA"). *Id.* ¶ 23.  The 2016 IMA had virtually the same terms as the original and was also signed by McKee.[3]  *Id.* ¶¶ 18, 23.  Both IMAs included the following identical arbitration clause ("the Arbitration Clause"):

> Any dispute arising under this Agreement shall be resolved by arbitration of the American Arbitration Association in the City of New York.  The arbitrator shall be selected by the parties from a panel of persons qualified and experienced with respect to jointly-trusted pension funds and investments on their behalf.

Doc. 32-1 (2014 IMA) ¶ 24; Doc. 32-2 (2016 IMA) ¶ 24.

One month later, on February 6, 2016, White Oak hired Niemie as Vice-Chairman. Doc. 1 ¶¶ 23, 25.  After the Trustees became aware that Niemie joined White Oak, they tasked the Plan's new chief investment officer, Case Fell, to closely inspect White Oak's obligations under the 2016 IMA. *Id.* ¶ 25.  Upon investigating the IMAs, Fell learned that White Oak had failed to meet its obligations with respect to its fee

---

[2] The Funds' LPAs had lock-up terms that granted White Oak "the 'sole discretion' to refuse to return the Plan's assets and instead substitute an interest-bearing note, at a rate of White Oak's determination." *Id.* ¶ 44.

[3] As with the earlier iteration, neither McKee nor Hakkak are individually parties to the 2016 IMA.

3

structure and reporting.  *Id.* ¶ 26.  Fell recommended the Trustees restrict White Oak from making additional capital commitments on the Trustees' behalf, which the Trustees then did.  *Id.*  In contravention of the restriction, White Oak continued to "make capital calls . . . to fund commitments that White Oak [had] already made."  *Id.*

Over the course of the following year, Fell spoke with Defendants to discuss White Oak's performance managing the Plan's investments.  *Id.* ¶ 27.  As part of this inquiry, Fell expressed concern that the Funds were being charged different management fees, in violation of the 2016 IMA's "most favored nation" clause.[4]  *Id.* ¶ 28.  Under the Pinnacle Fund, the management fees charged were 1.35%, but, under the Summit Fund, the fees were 1%.  *Id*.  Fell asked White Oak's counsel and McKee to explain why one fund was being charged more than the other, but he was given "contradictory explanations" about the difference in fees charged.  *Id.*  Fell also requested reimbursement of "overpaid fees," but White Oak did not agree to reimburse the fees.  *Id.*  Eventually, Defendants and Trustees scheduled to meet in New York on December 20, 2017 to address the Trustees' concerns.  *Id.*

However, on December 18, 2017, Defendants notified the Trustees that they planned to terminate the 2016 IMA in accordance with its 90-day notice period,[5] after which Defendants would refuse to return the Plan's money back to the Trustees and would operate the investments pursuant to the LPAs' terms, rather than the IMAs.  *Id.*

---

[4] The "most favored nation" clause prohibited White Oak from "disfavor[ing] . . . any client or class of clients in the allocation of investment opportunities . . . so that . . . such opportunities will be allocated among all . . . clients . . . on a fair and equitable basis."  Doc. 32-2 ¶ 8(a).

[5] The 2016 IMA Amendment and Termination provision provides:

> The Investment Manager may terminate this Agreement upon at least ninety (90) days prior written notice to the Trustees of such termination date. Notwithstanding the foregoing, in the event of termination of this Agreement by the Investment Manager, the Investment Manager agrees that, if requested by the Trustees, it will continue to act as Investment Manager until the earlier of the selection by the Trustees of its successor or the expiration of the six (6) month period commencing with the date on which this Agreement is scheduled to terminate in accordance with the Investment Manager's notice.

Doc. 32-2 at § 13(d).

4

¶ 29. Because the Trustees realized that the Plan would be without any protections under the 2016 IMA after the 90-day notice period expired, the Trustees invoked their right under § 13(d) of the 2016 IMA to extend the agreement for an additional six months, until September 18, 2018. *Id.* ¶ 30. After the September 18, 2018 termination, despite the requirement in the 2016 IMA that the money be returned at termination, White Oak retained control of the Plan's money and continued to charge the Plan fees.[6] *Id.*

  2. *The Arbitration*

During the six-month extension period, but before the 2016 IMA terminated, the Trustees initiated an arbitration proceeding against White Oak on July 31, 2018. *Id.* ¶ 33. Specifically, the Trustees alleged that White Oak breached its fiduciary duty because: (1) it never returned the Plan's money to the Trustees; (2) the Funds' LPAs lock-up provisions were improper; (3) White Oak, without authorization, charged the Plan retroactive fees; and (4) White Oak committed the Plan to indemnify it and Defendants against any losses or claims caused by White Oak's conduct, which benefitted Defendants in violation of the IMA.[7] *Id.* ¶¶ 35–57. After a December 2019 hearing at which multiple witnesses testified, the arbitrator issued a partial award on November 30, 2020 and a final award on August 4, 2021. *Id.* ¶ 33. The arbitrator held that White Oak engaged in "numerous prohibited transactions pursuant to ERISA Section 406(b)(1) [and 29 U.S.C. §] 1106(b)(1) and as a result received either compensation or benefits beyond that agreed to by the Trustees under the IMA" in violation of its ERISA fiduciary duty. *Id.* ¶ 33 (alteration in original). As a result, the arbitrator, *inter alia*, removed White Oak as the Plan's fiduciary and investment manager, ordered the disgorgement of profits, and

---

[6] Defendants dispute that they did not return the Plan's money. Doc. 31 (Defs.' Mem.) at 13. Instead, they repeat the arbitrator's findings that upon the expiration of the 2016 IMA, on September 18, 2018, they attempted to return the investments but that the Trustees had not appointed a new investment manager, thereby preventing Defendants from successfully transferring the money back. *Id.*

[7] The Trustees allege that Defendants personally benefitted because "under the LPAs [Defendants] granted themselves indemnity as individual officers in White Oak[; and] as founding shareholders, they benefited from limiting White Oak's potential exposure to liabilities." Doc. 1 ¶¶ 53–54.

awarded the Trustees $1,929,836.07 for the "Day One" management fees and $5,722,249.35 in attorneys' fees and costs. *Id.* ¶ 57.

On October 6, 2021, the Trustees petitioned the Southern District of New York to confirm the arbitration award ("the Confirmation Action"). Doc. 31 at 14. In response, White Oak moved to vacate the arbitration award in part. *Id.* The court, on March 17, 2022, substantively confirmed the award and denied White Oak's motion. *See Trustees of New York State Nurses Ass'n Pension Plan v. White Oak Glob. Advisors, LLC,* No. 21-cv-8330 (LAK)*, 2022 WL 815273 (S.D.N.Y. March 17, 2022). A couple of months later, White Oak petitioned the court to vacate the arbitration award for lack of subject matter jurisdiction,[8] but Judge Kaplan denied the motion on June 20, 2022. *See Trustees of New York State Nurses Ass'n Pension Plan*, 2022 WL 2209349.

Despite the decisions both by the arbitrator and the court, Defendants continue to hold the Plan's money, and the Trustees claim that Defendants engaged and are engaging in prohibited transactions contrary to their fiduciary duties. Doc. 1 ¶¶ 58–67.

### B. Procedural Posture

The Trustees filed this ERISA action against Hakkak and McKee, but not White Oak, on July 2, 2022. Doc. 1. The Trustees allege that the Defendants violated their fiduciary duties by "designing the terms of the Plan's investment[s] . . . such that . . . Defendants [benefited] beyond [the terms] that were specifically agreed to by the Trustees under the IMA." *Id.* ¶ 31. Two weeks later, on July 15, 2022, the Trustees requested that the present suit be assigned to Judge Kaplan, who presided over the Confirmation Action, on the grounds that the two cases are related. Doc. 10. Defendants opposed because they argued the suit against White Oak was only to confirm the

---

[8] White Oak brought the second motion to vacate the judgment in light of *Badgerow v. Walters*, 142 S. Ct. 1310 (2022), a March 31, 2022 U.S. Supreme Court decision that rejected the "look through" approach to subject matter jurisdiction on applications under Sections 9 and 10 of the Federal Arbitration Act. *See Trustees of New York State Nurses Ass'n Pension Plan v. White Oak Glob. Advisors, LLC*, No. 21-cv-8330 (LAK), 2022 WL 2209349, at *1 (S.D.N.Y. June 20, 2022)

arbitration award, whereas the instant case attempts to hold Defendants personally liable for several ERISA violations. Doc. 13. After the Court conferred with Judge Kaplan, the Court denied Trustees' request on July 19, 2022, finding that the two cases did not have to be related. Doc. 16. Defendants filed the instant motion to compel arbitration on September 21, 2022. Doc. 30.

## II.    LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA reflects "a liberal federal policy favoring arbitration agreements," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)), and places arbitration agreements on "the same footing as other contracts," *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)). But parties are not required to arbitrate unless they have agreed to do so. *Id.* (citing *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989)). Thus, before an agreement to arbitrate can be enforced, the District Court must first determine whether such an agreement exists between the parties. *Id.* This question is determined by state contract law principles. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).

The Court analyzes allegations regarding the formation of a valid arbitration agreement to determine if the allegations raise a genuine issue of material fact that must be resolved by a fact-finder at trial. *Schnabel*, 697 F.3d at 113; *see also Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) ("In the context of motions to compel arbitration brought under the [FAA] . . . the court applies a standard similar to that applicable for a motion for summary judgment. If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." (citations omitted)). On a motion for summary judgment, the Court considers "all relevant, admissible

evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits and draws all reasonable inferences in favor of the non-moving party." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (internal quotation marks and citations omitted).

The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made. *See Almacenes Fernandez, S.A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir. 1945) (noting that the parties seeking a stay in favor of arbitration "supported their application . . . by showing at least prima facie that" an agreement to arbitrate was proposed and accepted). This burden does not require the moving party to show that the agreement would be enforceable—only that an agreement to arbitrate existed. *See Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010). Once the existence of an agreement to arbitrate is established, the burden shifts to the party seeking to avoid arbitration to "show[] the agreement to be inapplicable or invalid." *Id.* (citation omitted); *see also Doctor's Assocs., Inc. v. Alemayehu,* 934 F.3d 245, 251 (2d Cir. 2019) ("An agreement that has not been properly formed is not merely an unenforceable contract; it is not a contract at all.").

If the Court determines that a valid arbitration agreement exists, the Court must then determine whether the particular dispute falls within the scope of the agreement. *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 (2d Cir. 2002) (quoting *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987)). If the dispute falls within the scope of the arbitration agreement, the "role of the court ends and the matter is one for arbitration." *Unique Woodworking, Inc. v. N.Y.C. Dist. Council of Carpenters' Pension Fund*, No. 07-cv-1951 (WCC), 2007 WL 4267632, at *4 (S.D.N.Y. Nov. 30, 2007).

### III. DISCUSSION

Defendants move to compel arbitration as non-parties to the 2016 IMA on the basis of equitable estoppel because they allege that they have a close relationship with

8

White Oak; the 2016 IMA contains a broad arbitration clause, and the Trustees' claims fall within the scope of the Arbitration Clause; and arbitrability should be decided by an arbitrator, not the Court.  Doc. 31 at 7–11.  The Trustees oppose arbitration on the basis that their claims against Defendants are outside the scope of the Arbitration Clause because the clause only narrowly applies to disputes between the Trustees and White Oak.  Doc. 33. at 12–20.  Further, the Trustees argue the Arbitration Clause reflects the parties' intent to have arbitrability be resolved by the Court, not an arbitrator; and, in any event, Defendants waived their right to submit the question of arbitrability to an arbitrator.  *Id.* at 21–24.

### A. Defendants May Equitably Estop the Trustees

The parties dispute whether Defendants, as non-parties to the 2016 IMA, can equitably estop the Trustees from denying arbitration.  Because arbitration is a matter of contract, principles of contract law apply—including equitable estoppel.  *See Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d. 773, 779 (2d Cir. 1995).  The Second Circuit has consistently held that non-signatories may invoke equitable estoppel to compel arbitration against signatories when the "issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *See, e.g., Choctaw Generation Ltd. Partnership v. American Home Assur. Co.*, 271 F.3d 403, 404 (2d Cir. 2001) (quoting *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999)); *see also Ross v. American Express Co.*, 478 F.3d 96, 98 (2d Cir. 2007) (noting that non-signatories may invoke equitable estoppel if the claims against them are "inextricably intertwined" with the arbitration agreement).  Thus, the determination of whether non-signatories may equitably estop signatories from avoiding arbitration turns on the "existence, scope, [and] validity of the arbitration agreements."  *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 209 (2d Cir. 2005).

Specifically, in determining whether an arbitration agreement allows non-signatories to invoke equitable estoppel, courts in this District have relied on a two-part "intertwined-ness" test. *Chase Mortg. Company-West v. Bankers Trust Co.*, 00-cv-0234 (MBM), 2001 WL 547224, at *2–3 (S.D.N.Y. May 23, 2001). This test requires the Court to examine (1) whether the signatory's claims "arise[] out of and relate[] directly to" the "subject matter" of the underlying agreement and (2) whether the non-signatory has a "close relationship" to a signatory of the agreement. *See id.* (alterations in original) (citations omitted); *see also JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004) (holding that signatories can be compelled to arbitration by non-signatories "where a careful review of the relationship among the parties, the contracts they signed[,] . . . and the issues that ha[ve] arisen among them discloses that the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed" (internal quotation marks omitted) (quoting *Choctaw Generation Ltd. P'ship*, 271 F.3d at 406)).

Here, neither party challenges the existence or validity of the arbitration agreement between the Trustees and White Oak. Rather, the parties dispute the scope of the Arbitration Clause as it relates to Defendants as non-parties to the 2016 IMA.

*1. Defendants and White Oak Have a Close Relationship*

Defendants argue that they have a "close relationship" to White Oak within the meaning of the "intertwined-ness" test because the Trustees have at all times been aware that Defendants are affiliated with White Oak and even alleged in their complaint that Defendants were directly involved in White Oak's misconduct. Doc. 31 at 18–19. Defendants further allege that, as executives of White Oak and co-portfolio managers of the Plan's investments, they were "reasonably seen" to the Trustees to be included in the Arbitration Clause from all disputes arising between the parties. *Id.* at 19 (citing *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008)). The Trustees present no arguments to the contrary, focusing instead exclusively on the first

10

"intertwined-ness" factor, whether the claims arise out of the 2016 IMA. *See generally* Doc. 33. Accordingly, absent any arguments in opposition, the Court finds that there is a sufficiently close relationship between Defendants and White Oak.

  2. *The Trustees' Claims Arise Out of and are Related to the Same Subject Matter as the IMA*

The "intertwined-ness" analysis also considers whether the Trustees' claims arise out of or are related to the same subject matter as the 2016 IMA. *See Ragone v. Atlantic Video at Manhattan Center*, 07-cv-6084 (JGK), 2008 WL 4058480, at *8 (S.D.N.Y. Aug. 29, 2008). This analysis is heavily dependent on the facts and circumstances surrounding the Trustees' claims and the underlying agreement. *See Chase Mortg. Company-West*, 2001 WL 547224 at *2 (noting that "the key" inquiry as to the subject matter requirement is "the nature of the claims asserted by the signatory against the non-signatory"); *see also JLM Indust., Inc.*, 387 F.3d at 178 (explaining that courts "have [not] specif[ied] the minimum quantum of 'intertwined-ness' to support a finding of estoppel" (citations omitted)).

Defendants argue that the Trustees' claims arise from the same subject matter as the 2016 IMA because the Arbitration Clause, which requires that "any dispute arising under" the 2016 IMA be resolved by an arbitrator, broadly includes all disputes between the parties. Doc. 31 at 23–27. Additionally, Defendants argue that the Trustees' own complaint "plainly implicates the parties' rights and obligations under the IMA." *See id.* at 25 (citing Doc. 1).

The Trustees primarily argue that the Arbitration Clause must be interpreted narrowly because the language utilizes the phrase "arising under," which the Second Circuit previously held in *In re Kinoshita*, 287 F.2d 951 (2d Cir. 1961), to be a narrow clause, and narrow clauses only include disputes about "literal interpretation or performance of the contract." Doc. 33 at 12–20 (citing *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218 (2d Cir. 2001)). Further, they argue that

11

the ERISA claims are statutory disputes, rather than disputes about contract performance under the requirements in the 2016 IMA, and therefore arise from different subject matter than the IMA and are outside the Arbitration Clause's scope. *Id.* at 19.

In *Kinoshita*, the Second Circuit held that, where an arbitration clause is limited to disputes "or controversies . . . 'under' or 'arising out of' the contract," the only claims subject to the arbitration clause are breach of contract claims. *Kinoshita*, 287 F.2d at 953. Thus, a fraudulent inducement claim, which is not a question about performing under the contract but rather about contract formation, was outside the scope of the arbitration clause. *Id.* More recently, however, the Second Circuit has noted that "*Kinoshita* was decided in 1961, well before the Supreme Court emphasized its preference for arbitration, and it has 'been frequently criticized' in the Second Circuit." *Galilea, LLC v. AGCS Marine Ins. Co.*, 427 F. Supp. 3d 518, 524 n.4 (S.D.N.Y. 2019) (citation omitted). As a result, *Kinoshita* has "frequently been limited to its [precise] facts" because it "is inconsistent with federal policy[] and yields questionable authority." *Id.*; *see also ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 33 (2d Cir. 2002) (noting that the Second Circuit has "since limited [*Kinoshita*'s] holding to its facts, declaring that absent further limitation, only the precise language in *Kinoshita* ["arising under"] would evince a narrow clause" (quoting *Louis Dreyfus*, 252 F.3d at 218) (alteration in original)); *Bristol-Myers Squibb Co. v. SR Int'l Bus. Ins. Co.*, 354 F. Supp. 2d 499, 505 (S.D.N.Y. 2005) (holding that *Kinoshita* applies only where "the operative language of the clause at issue . . . is substantially identical to that in the *Kinoshita* clause" and that a clause requiring arbitration of "[a]ny dispute arising under" a policy was "impossible to distinguish" from the *Kinoshita* clause, which addressed "any dispute or difference [that] should arise under this Charter").

Here, the Arbitration Clause asserts that "[a]ny dispute arising under this Agreement shall be resolved by arbitration of the American Arbitration Association [(AAA)] in the City of New York." Doc. 32-3 ¶ 24. While the Arbitration Clause

includes "arising under" language similar to that in *Kinoshita*, it also incorporates a reference to the AAA rules. *See id.* As noted previously, *Kinoshita*'s holding would apply here only if, the Arbitration Clause is substantially identical to that in *Kinoshita*. *See Bristol-Myers Squibb Co.*, 354 F. Supp. 2d at 505. Neither arbitration clause in *Kinoshita* or *Bristol-Myers Squibb* included the incorporation of the AAA rules. *See id.* Since the clauses here are not identical because of the incorporation of the AAA rules, the two clauses can be distinguished, thereby making *Kinoshita* inapposite in the instant case. *See S.A. Mineracao Dea Trindade–Samitri v. Utah Int'l, Inc.*, 745 F.2d 190, 194 (2d Cir. 1984) (holding that *Kinoshita* did not apply to a clause requiring arbitration of "any question or dispute aris[ing] or occur[ring] under" the agreement "[a]lthough the distinction defendants draw is far from overwhelming," it is sufficient to distinguish *Kinoshita*).

Moreover, multiple courts have found that clauses requiring "any dispute arising under" the agreement is a broad clause. *See e.g., id.* at 192, 194 (holding an arbitration clause providing that "[w]henever any question or dispute shall arise or *occur under* this [agreement], such question or dispute shall . . . be finally settled by arbitration" was broad (emphasis added)); *Genesco, Inc. v. T. Kakiuchi & Co. Ltd.*, 815 F.2d 840, 845, 854 (2d Cir. 1987) (holding that an arbitration clause providing that "[a]ll claims and disputes of whatever nature *arising under* this contract . . . shall be referred to [arbitration]" was broad (emphasis added)); *Watson v. USA Today Sports Media Grp., LLC*, No. 17-cv-7098, 2018 WL 2316634, at *2–3 (S.D.N.Y. May 8, 2018) (holding that an arbitration clause providing that "[a]ny dispute *arising under* this Agreement shall be determined and settled by arbitration . . . pursuant to the rules of the American Arbitration Association" was "a paradigmatic 'broad' arbitration clause" (emphasis added)). Therefore, the Arbitration Clause is distinguishable from *Kinoshita* in light of its reference to AAA rules, and it is a broad clause. Because it therefore encompasses the Trustees' ERISA

13

claims against Defendants, the claims arise out of and are related to the same subject matter as the 2016 IMA.

Accordingly, because there is a close relationship between the parties and the instant claims alleged arise from the same subject matter as the IMA, the Court holds that Defendants can equitably estop the Trustees from refusing arbitration.

### B. Clear and Unmistakable Evidence Exists that the Parties Intended to Submit the Question of Arbitrability to an Arbitrator

The parties also dispute whether this Court, as opposed to an arbitral tribunal, is the proper forum to determine the question of arbitrability. Defendants argue that the Arbitration Clause evidences the Trustees' intent to have an arbitrator decide the question of arbitrability. Doc. 31 at 27–30. Specifically, they argue that the Arbitration Clause's requirement that any "dispute arising under" the IMA be arbitrated includes disputes as to arbitrability. *Id.* at 29. The Trustees, however, argue that this Court should decide arbitrability because Defendants waived their right to submit the issue to arbitration, and the clear and unmistakable standard is not met. Doc. 33 at 20–24.

The issue of arbitrability—*i.e.*, whether a court or arbitrator has jurisdiction to hear whether certain claims can be resolved by arbitration—should be decided by courts, rather than arbitrators unless "there is clear and unmistakable evidence from the arbitration agreement . . . that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) (internal quotation marks and citation omitted); *accord Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n, Local 38*, 351 F.3d 43, 45 (2d Cir. 2003) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). Because arbitration agreements rarely directly state whether the court or arbitrator should decide the issue of arbitrability, "[i]n the absence of such clear language, 'courts must look to other provisions of the agreements to see what contractual intention can be discerned from them.'" *DDK Hotels,*

*LLC v. Williams-Sonoma, Inc.,* 6 F.4th 308, 318 (2d Cir. 2021) (quoting *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 191 (2d Cir. 2019)).

1. *Defendants Did Not Waive Their Right to Submit Arbitrability to an Arbitrator by First Asking the Court to Find That the Trustees' Claims Are Within the Scope of the Arbitration Clause*

The Trustees argue that Defendants waived their right to submit the question of arbitrability to an arbitrator because Defendants first asked the Court to find that the ERISA claims are within the scope of the Arbitration Clause, and a "party may waive its right to arbitration . . . by expressly indicating that it wishes to resolve its claims before a court." Doc. 33 at 21–22 (citing *Apollo Theater Found., Inc. v. W. Int'l Syndication*, No. 02-cv-10037 (DLC), 2004 WL 1375557, at *3 (S.D.N.Y. June 21, 2004) (alteration in original)). Defendants respond that they did not waive their arguments, but instead merely "argu[ed] in the alternative," and "alternative arguments are permitted by law." Doc. 34 at 13.

Waiver "is the intentional relinquishment or abandonment of a known right." *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) (citation omitted). Courts must determine if a party "knowingly relinquish[ed] the right to arbitrate by acting inconsistently with that right." *Billie v. Coverall N. Am. Inc.,* No. 22-cv-718, 2023 WL 2531396, at *3 n.3 (2d Cir. Mar. 15, 2023) (citation omitted). The Court considers factors such as "(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice." *Louisiana Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010) (citation omitted).

The Trustees make no arguments as to the *La Stadium & Exposition Dist.* factors. Indeed, the Trustees could not do so. The time elapsed from when litigation commenced, July 2, 2022 (Doc. 1), and Defendants' pre-motion letter indicating their intent to compel arbitration was less than two months, as the pre-motion letter was filed on August 17, 2022 (Doc. 27). *See PPG Indus. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 108 (2d Cir.

15

1997) (holding that a five-month delay between the defendants asserting arbitrable claims and plaintiff's motion to compel arbitration did not infer waiver of rights). And Defendants filed their motion to compel arbitration on September 21, 2022 (Doc. 30), approximately three months after the Trustees filed their complaint. Moreover, Defendants did not even respond to the complaint because they intended to file the instant motion, and there is thus no active discovery, as the case was stayed pending the resolution of the instant motion. *See* Aug. 31, 2022 Minute Entry.

The Trustees' authority as to waiver is unavailing. Unlike this case, *Apollo Theater Foundation* concerned a party that "expressly waived its right to arbitration by explicitly representing to [that court] that it wished to resolve all claims in [that] forum." 2004 WL 1375557, at *3 (citation omitted); *see also Gilmore v. Shearson/American Express Inc.*, 811 F.2d 108, 112 (2d Cir. 1987) ("[A] party may not freely take inconsistent positions in a law suit and simply ignore the effects of a prior filed document."). Defendants have not done so here. Defendants' mere decision to brief arbitrability arguments in addition to the arguments regarding the scope of the Arbitration Clause is not sufficient to constitute waiver under *Apollo Theater Found.* or *Gilmore*. Thus, the Court finds that Defendants have not demonstrated an intentional abandonment of their right to arbitration and have not waived their right to submit the question of arbitrability to an arbitrator.

2. *The Reference to the AAA Rules in the Arbitration Clause Provides Clear and Unmistakable Evidence that the Parties Intended to Submit the Question of Arbitrability to an Arbitrator*

Second, the parties dispute whether clear and unmistakable evidence exists that the parties intended to submit the question of arbitrability to an arbitrator. Defendants argue that the Arbitration Clause's reference to the AAA rules, which allows an arbitrator to rule on the issue of arbitrability, constitutes clear and unmistakable evidence. Doc. 31 at 29–30. Moreover, they oppose the Trustees' argument, that the Arbitration Clause is narrow based on *Kinoshita*, because the holding is "ancient," and since the 1961 decision

16

"the Second Circuit . . . [has] consistently held that arbitration provisions using the phrase 'arising under' are broad provisions." Doc. 31 at 10.

The Trustees respond that the parties intentionally chose not to adopt the "recommended" AAA arbitration clause, which covers "[a]ny controversy or claim arising out of *or relating to* this contract." Doc. 33 at 16–17 (emphasis added). Therefore, the Trustees assert that Defendants are wrong that mere reference to the AAA rules in the Arbitration Clause provides clear and unmistakable evidence that the parties intended arbitrability to be resolved by an arbitrator. *Id.* at 23. In regards to *Kinoshita*, the Trustees argue that it is instructive here since there the court distinguished between arbitration clauses that narrowly refer to claims that are *solely* "arising under" the contract, and those that "combine 'arising under' with other language, such as 'or out of,' or 'related to.'" *Id.* at 13. Thus, the omission of any language other than merely "arising under" in the Arbitration Clause renders it "not sufficiently broad" and further "reflects the parties' intent that the [Arbitration Clause] be narrowly applied." *Id.* at 13–14 (internal quotation marks omitted).

The Second Circuit has held that, where an arbitration provision incorporates rules under which an arbitrator decides issues of arbitrability, clear and unmistakable evidence exists that the partied intended an arbitrator, not the courts, to decide the threshold issue of arbitrability. *See Contec Corp.*, 398 F.3d at 208. AAA Rule 7(a) provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including . . . [on] the arbitrability of any claim or counterclaim." AAA, COM. ARB. RULES & MEDIATION PROCS. 13 (2013), www.adr.org/sites/default/files/CommercialRules_Web-Final.pdf. Accordingly, arbitration provisions incorporating AAA rules, coupled with a broad arbitration clause, demonstrate a clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator. *See Contec Corp.,* 398 F.3d at 208, 211 (holding that an arbitration clause agreeing to submit to arbitration "any controversy arising with respect to" the agreement and incorporating the AAA rules constituted clear and

17

unmistakable evidence of intent to arbitrate arbitrability); *Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400, 429 (E.D.N.Y. 2014) (finding that "[v]irtually every circuit to have considered the issue has determined that incorporation of the [AAA] rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability" (citation omitted)).

Here, the Arbitration Clause provides that "[a]ny dispute arising under this Agreement shall be resolved by arbitration of the American Arbitration Association." Doc. 32-2 ¶ 24. Taken in conjunction with its reference to the AAA rules, the Court finds that there exists clear and unmistakable evidence of the parties' intent to submit the question of arbitrability to an arbitrator. *See Contec Corp.*, 398 F.3d at 208, 211; *Paduano*, 55 F. Supp. 3d at 429. Accordingly, an arbitrator, and not the Court, must decide whether the instant claims are subject to arbitration.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion is GRANTED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 30, and stay the case. Parties are directed to submit a status within 48 hours of the arbitration decision.

It is SO ORDERED.

Dated:   August 2, 2023
         New York, New York

EDGARDO RAMOS, U.S.D.J.